DAVID A. SECOMBE *vs.* CHARLES KITTELSON, Treasurer, etc.

June 7, 1882.

**Constitution—Loan Amendment held Valid.**—The amendment to section 10, article 9, of the constitution of the state of Minnesota, adopted April 15, 1858, under the authority of which "the Minnesota state railroad bonds" were issued, was valid and operative as a part of the constitution of the state.

**Same—Original Defects Cured.**—Whatever irregularities, if any, existed in the mode of submitting it to the people, or of their adopting it, must be deemed cured by the subsequent admission of Minnesota as a state into the Union, and by the action of the state subsequent to its admission, in recognizing this amendment as valid, and ratifying it, by acting under its provisions.

**Same—Injunction Denied.**—Order denying the application of plaintiff for judgment enjoining the state treasurer from paying out of the state funds the interest upon the state bonds issued under the act of November 4, 1881, (Laws 1881, Ex. Sess. *c.* 1,) in adjustment of "the state railroad bonds," affirmed.

After the decision of the last preceding case (*State* v. *Young, ante,* p. 474,) an extra session of the legislature was called by the governor, at which the act in question in that case was substantially re-enacted, with the omission of the provisions for submission to a tribunal or to the people. Laws 1881, Ex. Sess. *c.* 1. Before the issuance or signature of the new bonds provided for in the act, the plaintiff in this action brought suit to restrain the governor from signing or issuing them, and on November 16, 1881, a writ of injunction was allowed by a court commissioner, and served upon the governor, who, nevertheless, proceeded to sign the new bonds, which were also countersigned as required by the act, and delivered in accordance with its provisions. The state treasurer being about to pay the interest on these new bonds the plaintiff brought this action in the district court for Hennepin county, to restrain him from doing so, on the ground that the constitutional amendment of April 15, 1858, under which the original state railroad bonds were, and on their face purported to be,

issued, was void; that the act of the extra session under which the new bonds were issued was void, and that the new bonds were signed and issued in violation of the injunction. The defendant did not appear in the action in the district court, and the plaintiff, having applied for judgment upon his default, which was denied by *Young,* J., appealed from the order denying the application.

*D. A. Secombe,* appellant, *pro se.*

*Wm. J. Hahn,* Attorney General, for respondent.

MITCHELL, J. This action was brought to restrain the defendant, as state treasurer, from paying, out of the funds of the state, the interest about to become due upon the bonds of the state of Minnesota, issued under the act of November 4, 1881, in adjustment of the so-called "Minnesota state railroad bonds." The injunction is asked upon the ground that the "Minnesota state railroad bonds," in adjustment of which the bonds about to be paid were issued, were themselves void, and no obligation of the state, because the pretended amendment of April 15, 1858, to section 10, article 9, of the state constitution, commonly called the "loan bill," under which these bonds were issued, was null and void, never having been lawfully proposed or submitted to the people of the state for their approval or rejection, and never having been adopted by the people of the state in accordance with the provisions of the constitution of the state. The plaintiff is entirely correct in stating that the question was not considered or decided in the case of *State* v. *Young, ante,* p. 474, for, no question having been there made as to their validity, it was assumed, for the purposes of that decision, that these state railroad bonds were legally issued.

In order to a correct understanding of this objection to the validity of this constitutional amendment and of the bonds issued thereunder, a brief history of the formation and adoption of our state constitution, and of the organization of a state government, may be necessary. On February 26, 1857, congress passed an act, commonly called "the enabling act," authorizing the people of Minnesota to form a constitution and state government, preparatory to their admission into the Union on an equal footing with the original states. (11 U. S. St. at Large, 166.) In pursuance of this act, delegates

were elected, who assembled at the time and place therein designated, and framed a constitution, which was submitted to the people for adoption or rejection on the 13th of October, 1857, at which election it was adopted by a large majority of the popular vote, and its adoption officially proclaimed on the 22nd day of December, 1857. Section 7, article 5, of this constitution provided that the term of each of the executive officers (governor, lieutenant governor, etc.) should commence "upon taking the oath of office *after the state shall be admitted by congress into the Union.*" (See Laws 1858, appendix, p. 392.) Section 16 of the schedule to the constitution provided for an election of state officers and members of the state senate and house of representatives, on the same day on which the vote was to be had upon the adoption or rejection of the state constitution. Section 6 of this schedule provided that the first session of the state legislature should convene at St. Paul on the first Wednesday of December, 1857. Section 5 of this same schedule provided that all territorial officers, civil and military, should continue to hold and exercise their respective offices until they should be superseded by the authority of the state.

In pursuance of these constitutional provisions, members of the state senate and house of representatives were elected, and assembled and organized as the first legislature of the state of Minnesota, at St. Paul, on the first Wednesday of December, 1857, and continued in session as such until the 26th of March, 1858; recognizing the territorial governor as governor of the state, and in his absence the secretary of the territory as acting governor of the state. (By section 3 of the organic act, establishing the territorial government of Minnesota, the secretary of the territory, in the absence of the territorial governor, executed and performed the duties and powers of governor.) Congress did not pass any act or resolution formally admitting Minnesota into the Union, until May 11, 1858, (11 U. S. St. at Large, 285,) up to which time the territorial governor, and in his absence the secretary of the territory, acted as governor. On the ninth of March, 1858, the state legislature passed "An act proposing an amendment to section 10, article 9, of the constitution, and providing for the submission of the same to the people." Laws 1858, *c.* 1. This was

signed and approved by the secretary of the territory, as acting governor, in the absence of the territorial governor, as were all acts passed at that session.    It was stated on the argument of this case that this act was never thus signed, and the printed volume of the laws of that session seems to sustain that statement.    But an inspection of the enrolled bill, now on file in the office of the secretary of state, shows that it was in fact signed by Charles L. Chase, secretary of the territory, as "acting governor."    This proposed constitutional amendment was adopted by a very large majority of the voters present and voting, on the 15th of April, 1858, and, after a canvass of the vote, was proclaimed as adopted, on the fifth of May, 1858, by the acting governor.    This amendment has always been popularly known as the "loan bill," and is that under the authority of which the "Minnesota state railroad bonds" were issued.

. It is urged that this amendment was never proposed or submitted to the people in accordance with article 14, § 1, of the constitution, which provides as to the manner in which proposed amendments shall be submitted to the people by the state legislature; nor in accordance with article 4, §§ 11, 12 and 21, which in substance provide for the approval of all bills by the governor of the state before they shall become laws, unless passed over his veto by a two-thirds vote of the senate and house of representatives; nor in accordance with article 5, § 6, which provides, in case of a vacancy in the office of governor, the lieutenant governor shall be governor during such vacancy.    The substance of all these objections, reduced to plain language, is that, when this amendment was pretended to be proposed and adopted, Minnesota, not having yet been admitted into the Union, was not a state, but still a territory, and therefore the territorial government in all its parts still in operation; that the constitution was not yet in force, and no part of a state government in operation; that therefore there was no constitution to be amended; and that this so-called state legislature had no authority to act, and, even if it had, the governor of the territory was not governor of the state, and had no authority to sign acts passed by a state legislature.    This position, if correct, leads to grave results.    The same objection would lie with equal force to all the laws (some ninety in number) passed at that

session of the legislature, some of them general laws of great public importance, and upon the validity of most of which important public and private interests depend., .It would also apply equally to another constitutional amendment (to section 7, article 5) adopted at the same time with that now under consideration.  In fact, so long have these laws been acted upon as valid, and so various and extensive are the interests, public and private, which depend upon their validity, and so largely have they been interwoven with subsequent statutes, that it is difficult to anticipate how serious would be the consequences of holding them null and void.

The question as to when a territory ceases to be such and becomes a state, and as to when the constitution and governmental machinery of a new state goes into operation, is one upon which not even courts and constitutional lawyers are agreed.  One theory is that a territory continues in all respects a territory until admitted into the Union by act of congress, and that, until such act of admission, the proposed state constitution cannot take effect, nor any part of the machinery of a state government go into operation.  Another theory is that where, under an enabling act of congress, the people adopt a state constitution and form a state government, such constitution goes into effect upon its adoption by the people, and that the former territory thereby becomes a state, although not in the Union, for the purposes of representation in congress, until formally admitted by congress.  A third theory, which is really only an extension of the one last named, is that an enabling act operates as a constitutonal act of admission, and that when a state complies with the conditions of that act, she is a state in the Union for all purposes, without any further action on the part of congress.  See *Scott* v. *Detroit Young Men's Society's Lessee*, 1 Doug. (Mich.) 119; *Campbell* v. *Fields*, 35 Tex. 751. It is apparent from the contemporaneous history of our state, and especially from the debates in the first state legislature, that the theory upon which they acted was that the state constitution was in force, and the state government under it went into operation, from the date of its adoption by the people, and that thereafter the governor of the late territory acted, not as governor of the territory, but as governor of the state, under the authority of section 5 of the schedule of the

constitution.   The language of the enabling act of congress has certain peculiarities which tend to give special force to this theory in the case of Minnesota.   Section 1 of this act authorizes the inhabitants "to form for themselves a constitution and state government by the name of the state of Minnesota, *and to come into the Union* on an equal footing with the original states, according to the federal constitution."   'Nowhere in the act is there any suggestion that any future act of admission would be necessary.

But we do not deem it material, and hence it is not necessary to be decided, which of these theories is correct.   The government thus constituted was the *de facto* government from the autumn of 1857 till May 11, 1858, exercising all the functions of a state government by and with the common consent of the people.   This constitutional amendment, proposed and submitted by the legislature, was adopted by the people as a part of the fundamental law of the state, and subsequently recognized and acted upon as such by every department of the state government.   As ultimate sovereignty is in the people, from whom all legitimate civil authority springs, and inasmuch as in the inception of all political organizations it is this original and supreme will of the people which organizes civil government, a court has no right to inquire too technically into any mere irregularities in the manner of proposing and submitting to the people that which they have solemnly adopted, and subsequently recognized and acted upon, as part of the fundamental law of the state.   We doubt whether a precedent can be found in the books for the right of a court to declare void a constitution, or amendment to a constitution, upon any such ground.   But, however this may be, there are, in our opinion, two conclusive reasons why the right to inquire into any irregularities in the mode and means by which this constitutional amendment was proposed and adopted must be now forever closed:   *First.*  Such irregularities, if any, must be regarded as healed by the subsequent act of congress admitting Minnesota into the Union.   Cooley on Const. Lim. 27.   *Second.*  They must be deemed cured by the recognition and ratification of this amendment, as a part of the constitution, by the state after its admission into the Union.   This was done by the issue of the state railroad bonds, and accepting security for the protection

of the state under its provisions, and by saving and reserving, in the very constitutional enactment expunging it from the constitution, "all rights, remedies, and forfeitures accruing under said amendment,"— rights and remedies and forfeitures of which the state subsequently availed itself. The views heretofore expressed render it unnecessary to consider the second ground upon which plaintiff claims that this amendment was null and void, to wit, "that the attempt to make it was oppugnant to the constitution, the laws, and the sovereignty of the United States."

This disposes of this case upon the merits adversely to the plaintiff.

There was another ground upon which we might have summarily disposed of it. It is the settled law of this state, if anything can be settled by repeated adjudications, that an executive officer of the state is not subject to the control or interference of the judiciary in the performance of duties belonging to him as an executive officer, and that no act done or threatened to be done by him in his official capacity can be brought under judicial control or interference by *mandamus* or injunction; that this is the rule even when the act is purely ministerial. On this ground alone the order appealed from might have been affirmed; but the case having been fully argued by plaintiff upon the merits, and it being one involving important questions of public interest, we have deviated from what would be our usual practice, and considered and decided the case upon the other points made by counsel.

The court below properly denied plaintiff's application for judgment. Order affirmed.