# Armstrong et al., Appellants, v. King, Secretary of Commonwealth.

*Constitutional law—Constitutional amendments—Submission to people—Adoption by legislature—Interpretation of Constitution—Collateral attack—Resolutions of 1921, P. L. 1236, and 1923, P. L. 1121, unconstitutional.*

1. Under Article XVIII of the Constitution of this State, amendments cannot be submitted to the electorate for approval oftener than once in five years.

2. A practice which is antagonistic to the Constitution cannot be sustained, no matter how long it has been followed.

3. Although contemporaneous and long continued uniform interpretation should and does assist in construction, in cases where there is a doubt regarding the actual meaning of a provision in the Constitution, yet the courts cannot accept such an interpretation if erroneous, and the language to be construed is plain and capable of but one meaning.

4. If objection is made to a proposed constitutional amendment before it has been voted on by the people, it may be directly challenged for a noncompliance with any of the preliminaries to its submission.

5. Where such proposed amendment has been adopted by two successive legislatures, has been approved by a majority of the electors, has been acted upon by those charged with administration under it,

and public or private rights would be injuriously affected by setting it aside, it is too late to do so, even by a direct attack on the ground that it was submitted for approval at the wrong time, and it cannot then be collaterally attacked for any reason.

6. When a claim is made that a proposed constitutional amendment has not been adopted by the required majority of the electors, this fact is open to judicial inquiry after the people have voted, but the details leading up to the submission should not be a subject of consideration at that time, even when a direct attack is made, unless the alleged defects are so serious as to lead to the belief that possibly the people were not properly advised when they voted for the members of the second legislature, who were to act upon the proposed amendment, or that, in one or the other of the general assemblies, or at the polls, a fair vote was not obtained.

7. The joint resolutions adopted by the legislatures of 1921 and 1923 (P. L. 1921, page 1236, and P. L. 1923, page 1121) requiring the proposed amendment therein set forth to be submitted to the people in November of this year (1924) is unconstitutional, because another amendment was submitted to them for approval in November of last year.

Argued May 26, 1924.   Appeal, No. 2, May T., 1925, by plaintiffs, from decree of C. P. Dauphin Co., No. 770, Equity Docket, No. 36, Commonwealth Docket, 1924, dismissing bill in equity, in case of William Armstrong et al., taxpayers, v. Clyde L. King, Secretary of the Commonwealth.   Before MOSCHZISKER, C. J., FRAZER, WALLING, SIMPSON, KEPHART, SADLER and SCHAFFER, JJ. Reversed.

Bill for injunction.   Before HARGEST, P. J.
The opinion of the Supreme Court states the facts.
Bill dismissed.   Plaintiffs appealed.

*Error assigned* was, inter alia, decree, quoting record.

*Allan D. Miller,* with him *Walter L. Miller,* for appellants.—The bonus amendment should not be submitted to the voters for these reasons:

It is not an amendment to the existing Constitution.

It has not been properly acted on by two successive legislatures as required by article XVIII, section 1, of the Constitution.

It contains more than one amendment: Jones v. Mc-Claughry, 169 Iowa 281.

Submission of the proposed amendment will be in violation of that portion of article XVIII, section 1, of the Constitution which reads, "But no amendment or amendments shall be submitted oftener than once in five years."

*William A. Schnader,* Special Deputy Attorney General, with him *George W. Woodruff,* Attorney General, for appellee.—There is a distinction between an "amendment" and an "amendment section" of the Constitution: Gabbert v. Ry., 171 Mo. 84.

The adoption of the bonus amendment cannot have the effect of reducing the state's borrowing capacity for highways because the legislature has never proposed such reduction, and approval by the electors of a proposal to amend the Constitution cannot cure defects in the procedure required for the adoption of constitutional amendments: Com. ex rel. v. Griest, 196 Pa. 396; Collier v. Frierson, 24 Alabama 100; Oakland Paving Co. v. Hilton, 69 Calif. 479; McCreary v. Speer, 156 Ky. 783; Utter v. Moseley, 16 Idaho 274.

If the bonus amendment be submitted to the electors and approved, it should be construed as if it had been approved contemporaneously with the highway amendment of 1923: Fitzgerald v. Cleveland, 88 Ohio 338; Rose v. Portland, 82 Oregon 541; Com. v. Pottsville, 246 Pa. 468.

The lower court's interpretation of the provision, that "no amendment or amendments shall be submitted oftener than once in five years," should be sustained: Com. v. Balph, 111 Pa. 365; Weigold v. R. R., 208 Pa. 81.

The voters can be fully acquainted with the effect of approval of the bonus amendment.

*Frank L. Pinola,* for American Legion, cited: Knox v. Lee, 12 Wall. (U. S.) 457; Prigg v. Com. of Penna., 16 Pet. (U. S.) 539; Moers v. City of Reading, 21 Pa. 188; Cronise v. Cronise, 54 Pa. 255.

OPINION BY MR. JUSTICE SIMPSON, July 8, 1924:

On November 6, 1923, an amendment to the Constitution of the State was submitted to its qualified electors and approved by them. Because the defendant, as secretary of the Commonwealth, proposes to advertise another amendment for submission to them at the election to be held on November 4th of this year, and to notify the county commissioners, throughout the State, to print the official ballots accordingly, a taxpayer's bill was filed in the court below, asking that he be enjoined from so doing, because, inter alia, article XVIII of our Constitution expressly provides that "no amendment or amendments shall be submitted oftener than once in five years." The court below dismissed the bill and plaintiff appeals.

The constitutional provision referred to is as follows: "Any amendment or amendments to this Constitution may be proposed in the Senate or House of Representatives; and, if the same shall be agreed to by a majority of the members elected to each House, such proposed amendment or amendments shall be entered on their journals with the yeas and nays taken thereon, and the Secretary of the Commonwealth shall cause the same to be published three months before the next general election, in at least two newspapers in every county in which such newspapers shall be published; and if, in the General Assembly next afterwards chosen, such proposed amendment or amendments shall be agreed to by a majority of the members elected to each House, the Secretary of the Commonwealth shall cause the same again to be published in the manner aforesaid; and such proposed amendment or amendments shall be submitted to the qualified electors of the State in such manner, and at such time at least three months after being so agreed to

by the two Houses, as the General Assembly shall prescribe; and, if such amendment or amendments shall be approved by a majority of those voting thereon, such amendment or amendments shall become a part of the Constitution; but no amendment or amendments shall be submitted oftener than once in five years. When two or more amendments shall be submitted they shall be voted upon separately."

It is clear that unless we wholly ignore the words "but no amendment or amendments shall be submitted oftener than once in five years,"—a conclusion for which no one does, or reasonably can contend,—we must either construe the language exactly as it is written, namely, as prohibiting the submission of any amendments "oftener than once in five years," or we must interpret it as referring to the amendments specified in the preceding part of the article, which would result in precluding only the resubmission of amendments once defeated by the people. We cannot take this latter alternative, however, because the language used will not permit us to do so. When it was intended to refer to the amendments dealt with in the earlier part of the article, the clause so providing was always preceded by the word "such." Thus it is said, if "any amendment or amendments" are agreed to by the legislature, *"such* proposed amendment or amendments" shall be entered on their journals and duly advertised, and if the next legislature shall agree to *"such* proposed amendment or amendments" another publication shall be had, and *"such* proposed amendment or amendments" shall be submitted to the electors for approval, and if *"such* proposed amendment or amendments" are approved by a majority of those voting thereon, *"such* amendment or amendments shall become a part of the Constitution." On the other hand, the prohibiting clause does not use this or any similar word; it simply says "but no amendment or amendments shall be submitted oftener than once in five years." This broadening of the language

necessarily implies an intentional broadening of thought; hence it must be construed as it is written, namely, as a purpose on the part of the people that they shall not be asked to amend their Constitution "oftener than once in five years."

As bearing upon this question, though not conclusive of it, we have several supporting facts. In the constitutional convention of 1838, after a number of long debates on the general subject of amendments, the words "but no amendment or amendments shall be submitted to the people oftener than once in five years," were presented as an amendment to the pending article on the subject: Vol. 12, Proceedings and Debates of Pennsylvania Constitutional Convention, 1838, page 307. It was repeatedly stated, as a reason for its adoption by those favoring it, and for its rejection by those opposing it, that, if adopted, no amendments of any kind could be submitted oftener than once in five years. Nevertheless, it was approved by the convention, ratified by the people, and for 36 years, during the entire time that Constitution was in force, the five years' limitation was never infringed; the legislature thus apparently observing the construction expressed in the convention. The committee on future amendments of the constitutional convention of 1873, omitted those words from the article as reported by it, but the convention reinserted them (5 Debates of the Constitutional Convention, page 13), the entire debate showing once more that they were considered as excluding any and all amendments within the period stated. Again the people ratified the action of their convention, and, for 38 more years, the five-year period was never infringed by amendments of any kind. We therefore have the fact that two constitutional conventions interpreted the language to mean exactly what it says, without any qualification whatsoever, and for 74 years this construction was apparently accepted as correct, by the people acting through 57 of their legislatures. It is of course true that possibly other reasons explain some of these

facts, but it is improbable that all of them could be otherwise accounted for; be this as it may, however, the matter is of importance in considering the instant question, and certainly it wholly excludes any idea that those words, because of usage, should be given any other than their normal meaning.

For the purpose of antagonizing this inevitable conclusion, we are told that the practice has been to submit proposed amendments without reference to the five years' limitation; that large sums have been loaned on the faith of the people's approval of amendments thus submitted; and that these loans will be imperiled, if we sustain the contention made upon this point. If this were so, it would be a cause of much regret; but we would nevertheless be required to uphold the Constitution and ignore the erroneous practice, whatever the result might be (Heisler v. Thomas Colliery Co., 274 Pa. 448, 453); especially as we have never heretofore decided, or even been asked to decide, what is the meaning of the constitutional provision. Evidently the court below was impressed by the argument thus presented, for although the trend of its opinion shows it believed the true construction of the provision to be as stated, this interpretation was not accepted because, while the legislature's construction "is not binding on the courts, yet the fact that the Constitution has been thus amended, and large amounts of bonds issued on the strength of such amendments, without question, is, to some extent, indicative of the intention of the people in adopting this Constitution." The effect of this statement is that because the legislature, on four different occasions, beginning in 1911, violated this clause of the Constitution, and no one legally attacked its action in so doing, these facts indicate what the people meant when they adopted it in 1838 and 1873. Of course such a conclusion could not be possible under any circumstances, but the facts already detailed show how especially inaccurate it is in the present instance. Moreover, although contemporaneous and long continued uniform

interpretation, should and does assist in construction, if there is any doubt whatever as to the actual meaning, the courts cannot go beyond this, even in determining whether or not a statute is unconstitutional (Cooley's Constitutional Limitations, 7th ed., 106; Kucker v. Sunlight Oil & Gasoline Co., 230 Pa. 528; Collins v. Kephart, 271 Pa. 428); a fortiori they cannot in deciding the meaning of a constitutional provision.

The present Constitution was amended in 1901, 1909, 1911, 1913, 1915, 1918, 1920 and 1923, those of 1911, 1915, 1918 and 1920, being amendments of article I, section 8, relating to municipal indebtedness. It will be noticed that the untimely submissions were in 1911, 1913, 1918 and 1923. Had injunctions been sought at an appropriate time, against their then present submission, doubtless they would have been enjoined. No such action was applied for, however, the people gave their approval to the amendments, and to this day no one has challenged the fact that they are properly a part of the Constitution. The affirmative action of two successive legislatures, the form of submission, the approval by a majority of the electors, and all other steps necessary to give the amendments validity, were duly and properly taken; only the dates of submission were mistakes. It is now too late to directly attack the amendments on this ground, and they cannot be collaterally attacked for any reason.

Under what circumstances, if any, a direct attack can be made on a constitutional amendment, after adoption by the people, because of a failure to comply strictly with some procedural condition leading up to the submission, has been the subject of many and lengthy opinions, with results impossible of reconciliation. Usually the assaults upon proposed amendments have been made before submission; but the curious will find practically all of the cases decided prior to 1909, cited and reviewed in McConaughy v. Secretary of State, 106 Minn. 392. One of the extreme authorities is Koehler and Lange v.

Hill, 60 Iowa 543, where the state constitution provided that a proposed amendment must be entered upon the legislative journals, and it was held that because it was not there entered at length the amendment was not effective, even though it had been adopted by the people. The opinion states (page 549) : "It matters not if not only every elector, but every adult person in the State, should desire and vote for an amendment to the Constitution, it cannot be recognized as valid unless such vote was had in pursuance of, and in substantial accord with, the requirements of the Constitution," including an exact entry on the journals.   That is to say, if the clerk in copying a proposed amendment, by mistake or fraud omits even an immaterial part of it (as was the omission in that case), and the members of the legislature do not examine the journal to see that it is correct, the amendment would fail even though approved by the unanimous vote of all the electors.

Other courts of last resort have taken a more reasonable view, but we shall only refer, at this time, to two of their decisions.   In the Constitutional Prohibitory Amendment Cases, 24 Kansas 700, 710 it is said, in an opinion written by Justice BREWER, who later became a Justice of the Supreme Court of the United States, that "The two important, vital elements in any constitutional amendment, are the assent of two-thirds of the legislature, and a majority of the popular vote.   Beyond these, other provisions are mere machinery and forms. They may not be disregarded, because, by them certainty as to the essentials is secured.   But they are not themselves the essentials."   The other case to which attention is called in this connection, is State v. Winnett, 78 Neb. 379, 387, where it is said that, if a too strict adherence were given to some of the requirements, "The will of the people of the State would be defeated by an unimportant accident over which they had no control.   If other provisions of the Constitution are mandatory and are to be taken literally, these provisions, by which the people

have consented to place restrictions upon their own power in adopting amendments to the Constitution, should not be so construed [after approval by the people]. We should inquire into the fair purpose and meaning of such restrictions, and should regard the substance rather than the letter of such requirements."

It would be idle to attempt to review the irreconcilable opinions on the subject. Our own decisions, while few in number, apply the "rule of reason" in construing constitutional provisions, as well as in interpreting statutes, and no just cause appears why this should not be so. The Constitution is, of course, the paramount law, and must be construed in that light; but, after all, it is an instrument prepared by human beings, and contains within itself the proof of their frailties, as we are frequently advised by the arguments presented on the many questions arising under it. Although, being a constitution, it should contain only that which is fundamental, we are constantly made aware of the fact that many details are embodied in it, which more properly belong in legislation: See Com. v. Moir, 199 Pa. 534, 553. Because of these facts, all that is said in the Constitution is not of the same mandatory force; in the nature of things, some of the detailed provisions must be treated as directory only, as we pointed out in Com. v. Griest, 196 Pa. 396, when we were considering this article on amendments. Indeed the Constitution itself expresses this inequality, for by article I, section 26, it is declared that the preceding twenty-five sections are "excepted out of the general powers of government and shall forever remain inviolate."

For these reasons, it is clear to us that, in matters pertaining to the Constitution, consideration must be given not only to the design of the particular provision under discussion, but also to the time when a judicial investigation must be applied for, if it is not to be deemed too late for consideration. As has already been pointed out, this is essential in the instance being considered, in order

that the real purpose shall be conserved and not defeated by a too rigid adherence to relatively unimportant details.   If objection is made before an amendment has been voted on by the people, it may well be held to be in time to challenge a noncompliance with any of the preliminaries to the submission.   Upon a complaint then made, no error or fraud of a clerk could defeat the legislative right to have an amendment submitted to the people.   If, for instance, the proposed amendment was duly adopted by two legislatures, but was not entered on their journals, steps could be taken to have the journals corrected, and the amendment submitted.

A new status has arisen, however, once the people have approved the proposed amendment.   Whether or not it has been adopted by the required majority of the electors, is, of course, still open to judicial inquiry (McConaughy v. Secretary of State, supra; Tecumseh National Bank v. Saunders, 51 Neb. 801); but the details leading up to the submission should not be subjects of judicial consideration at that time, even when a direct attack is made, unless the alleged defects are so serious as to lead to the belief that possibly the people were not properly advised when they voted for the members of the second legislature, who were to act upon the proposed amendment, or that, in one or the other of the general assemblies, or at the polls, a fair vote was not obtained. If this character of objection has not been made; if the amendment has been twice "agreed to by a majority of the members elected to each house"; if it has been submitted to the people and "approved by a majority of those voting thereon"; and if the result has been acquiesced in, and public or private rights would be disturbed by allowing such an attack to be made, it is then entirely too late to permit it to be made effectively.   A fair approval of an amendment, twice duly passed by the legislature, is, in effect, though not technically, a judgment of the electorate, and a collateral attack upon it should not be allowed.   "In a collateral proceeding, the

certificate of the political authorities that an amendment was duly ratified, is conclusive": 12 Corpus Juris 695.

In Secombe v. Kittelson, 29 Minn. 555, a bill was filed to enjoin the state treasurer from paying interest on bonds issued under a constitutional amendment which, it was alleged, had been submitted for approval without any authority whatever. The court refused to pass upon the question as to whether or not the amendment had been properly submitted, saying that the issuing of the bonds in accordance with it, and the general acceptance of the amendment, were a recognition of it which forbade the courts from declaring it was not a part of the Constitution. So, too, in Nesbit v. The People, 19 Colo. 441, 455, where the attack was made after years of recognition of an amendment as proper, and repeated unchallenged action under it by the several departments of government, the court said: "To overthrow amendments thus submitted and approved—thus accepted and acted upon—would not only paralyze the jurisprudence of our State and affect rights and interests, public, private and corporate, in a degree wholly irreparable, but would disorganize the different departments of government that have grown up under those amendments, to such a degree as to almost produce a state of anarchy. The approval of these amendments by the people, and their acceptance by the representatives of the people have, in this instance, practically removed the question of their validity from the sphere of mere judicial authority to the sphere of the political power of the State; the conditions are such that the judiciary ought not attempt to declare them void." This was, of course, an extreme case, but the difference between it and the others raising the same question of validity, is one in degree only, and not in kind. If the people can validly amend their constitution only when they proceed to do so in exact compliance with the procedural provision of the amendatory article, and the time when an attack can be made on this ground is of no moment, as some courts con-

tend, then the results which would flow from requiring a strict compliance must also be of no moment to the judicial mind.

We are also cited to 12 Corpus Juris 689, as sustaining the principle of strict construction. It is there said: "Provisions of the constitution to the effect that amendments may be submitted only at certain times, or at certain elections, are mandatory and must be complied with." That is undoubtedly true, if proper application is made in due course, and we have so held in the instant case; but it is not correct, so far as regards this State, if it is meant to say that the conclusion stated leaves the matter indefinitely open for consideration. None of the authorities cited to sustain the text so holds; indeed, none of them deals with the effect of an amendment submitted to the people, approved by them and acted upon by the political departments of government. This becomes apparent when their actual status is set forth. In Tecumseh National Bank v. Saunders, 51 Neb. 801, it was simply held that the amendment was not adopted by a majority of the electors, as required by the Constitution. People ex rel. v. Curry, 130 Cal. 82, was a bill to enjoin the submission of the proposed amendment to the people. Chase v. Board of Election Commissioners of Wayne County, 151 Mich. 407, and State of Kansas ex rel. v. Sessions, 87 Kansas 497, was each an application for a mandamus to compel the proper officer to take the necessary steps to submit a proposed amendment to the people. Cartledge v. Wortham, 105 Texas 585, was an action to contest an election and to restrain the secretary of state from canvassing the returns on the adoption of a proposed amendment; it was held the amendment was legally submitted and approved. Finally, Moore v. Smith, 140 Ga. 854, was a habeas corpus by a convicted murderer to obtain his discharge, upon the ground that the county in which he was tried was established in violation of the Constitution of the State, and the writ was dismissed.

Our own cases uniformly apply the wiser rule of reasonable construction. By the Act of June 2, 1871, P. L. 282, it was directed that "the question of calling a convention to amend the Constitution of this Commonwealth be submitted to a vote of the people at the general election, to be held on the second Tuesday of October next." Nothing else was submitted to them, they voted on nothing else, and the only effect of their affirmative action was to authorize, but not require, the legislature to call a convention, upon such terms and conditions as was deemed best: Wells v. Bain, 75 Pa. 39. The General Assembly, acting on the authority thus given, passed the Act of April 11, 1872, P. L. 53. It specifically provided (1) "that one-third of all the members of the convention shall have the right to require the separate and distinct submission, to a popular vote, of any change and amendment proposed by the convention" (section 4) ; (2) that "nothing herein contained shall authorize the said convention to change the language, or to alter in any manner the several provisions of the ninth article of the present Constitution, commonly known as the declaration of rights, and the same shall be excepted from the powers given to said convention, and shall be and remain inviolate forever" (section 4) ; and (3) that the question of adopting the Constitution, as proposed by the convention, "shall be conducted as the general elections of this Commonwealth are now by law conducted" (section 6). The second of these matters followed article IX, section 26 of the Constitution of 1838, then in force, which provided, regarding its declaration of rights, that "To guard against transgressions of the high powers which we have delegated, we declare that everything in this article is excepted out of the general powers of government, and shall forever remain inviolate."

In Wells v. Bain, supra, two bills in equity were filed in this court averring, inter alia, that the convention had passed an ordinance for the submission of the proposed new Constitution to a vote of the people, the election,

in the City of Philadelphia, to be conducted by different
election officers, and the returns made to and counted by
other officials, than those by whom "general elections
......are now by law conducted"; and also that al-
though more than "one-third of all the members of the
convention" required "the separate and distinct submis-
sion" of the judiciary article, the convention refused to
thus submit it.   To these bills demurrers were filed,—
which of course admitted the facts set forth in the bills,
—argument was had thereon, and our decision rendered
before the date fixed for the election.   We held that
the convention had only the powers delegated to it by the
legislature; that the election must be conducted by the
usual election officers, and the votes counted, returned
and the result computed as in general elections; but,
as to the other point, we said (page 55) : "The question
of a separate submission being one committed to the
whole body, of which the requiring third is itself a part,
it must be presumed that the decision of the body as a
whole was rightly made, and either that the request was
not made by a full one-third of all the members, or, if
made by one-third, it was not in a regular or orderly
way.   It would be a violent presumption to suppose that
the body would wilfully disregard their own oaths, as
well as a full and orderly request.   And if they did this
wrong, no appeal is given to the judiciary, and the error
can be corrected only by the people themselves, by reject-
ing the work of the convention.   If the people, notwith-
standing, choose to ratify their work, with them lies the
consequence.   Mere errors of procedure will then be of
no avail.   The convention having in that matter acted
within the scope of its undoubted power, we must take
its decisions as final, and leave correction to the power to
which it belongs."

In Woods's App., 75 Pa. 59, a bill was filed in the
court of common pleas, alleging the convention had ex-
ceeded its delegated powers in amending the declaration
of rights; on demurrer that court held the legislature

could not thus limit the convention, and dismissed the
bill.    The case reached us after the people had voted to
adopt the Constitution as submitted to them.    We de-
cided that, although the court below was in error in its
conclusion, the matter had passed beyond judicial con-
sideration, saying: "The change made by the people in
their political institutions, by the adoption of the pro-
posed Constitution since this decree, forbids an inquiry
into the merits of this case.    The question is no longer
judicial, but in affirming the decree we must not seem
to sanction any doctrine in the opinion, dangerous to the
liberties of the people.    The claim for absolute sov-
ereignty in the convention, apparently sustained in the
opinion, is of such magnitude and overwhelming impor-
tance to the people themselves, it cannot be passed un-
noticed"; and the opinion proceeded to show that it
did not exist, but that the convention possessed only the
delegated powers given to it by the legislature.

It will be observed that the gravamen of these opinions
is that when there is a "change made by the people in
their political institutions......the question is no
longer judicial."    This is in accord with Luther v. Bor-
den, 7 Howard 1, 39, where it is said: "The political
department has always determined whether the proposed
Constitution or amendment was ratified or not by the
people of the State, and the judicial power has followed
its decision."    We are not unmindful that both our
cases arose after action by a constitutional convention,
and that in some jurisdictions it is held that a conven-
tion's authority is plenary, even though the statute pro-
viding for it undertakes to limit its powers.    The cases
cited show, however, that the powers of the convention
of 1873 were strictly limited to those delegated to it
by the legislature, and hence the members of the con-
vention, in preparing the Constitution, were in exactly
the same position as members of the legislature in pro-
posing amendments; in each the approval by the people

gives unattackable validity to the Constitution or amendment submitted to them.

In Com. v. Griest, 196 Pa. 396, 416, we said: "We think that the provision as to the publication three months before the next general election, as prescribed in the first clause of article XVIII, should be regarded as merely a directory provision, where strict compliance with a time limit is not essential." True, this statement was not necesary to a decision of the case; but, as it was said before the amendment under consideration had been submitted to the people, it is at least authority for the conclusion that errors in mere procedural matters should not be given such weight as would invalidate amendments already adopted and acted on, which appellee fears would result if we grant the injunction applied for in the instant case.

In view of what has been said, it is not necessary to consider the other objections raised to the proposed amendment. If, in the future, any two succeeding legislatures think such an amendment should be submitted to the electors, doubtless it will be so drawn as to avoid raising these objections. It is sufficient at present that the direction in the joint resolutions now under consideration (P. L. 1921, page 1236, and P. L. 1923, page 1121), that the proposed amendment be submitted to the people "on the Tuesday next following the first Monday of November in the year 1924," is unconstitutional, and hence defendant's attempt to justify his proposed actions because of this direction necessarily fails.

The decree is reversed, the record is remitted, and the court below is directed to enter a decree enjoining defendant from advertising that the proposed amendment to the Constitution is to be voted upon by the qualified electors of the State, as provided by the joint resolution above referred to, and from certifying to the county commissioners, of the several counties throughout the Commonwealth, that it is to be voted upon by said electors; the costs of this appeal to be paid by appellee.