## Commonwealth v. Randall

*G. H. Detweiler* and *Murdoch, Paxson, Kalish & Dilworth,* for relator.

*B. B. Hoar* and *L. B. Schofield,* for defendant.

GORDON, JR., P. J., November 12, 1946.—This action of quo warranto is brought upon the relation of William Reinhardt to determine his right to the office of member of the Philadelphia Housing Authority, heretofore held, and still claimed, by defendant Randall. Under the Housing Authorities Law of May 28, 1937, P. L. 955, sec. 5(*b*), the authority consists of five members, of whom "in cities of the first class the mayor shall appoint two members, the city controller shall appoint two members, and the four members thus appointed shall select a fifth member". In accordance with the provision of that act defendant, Roland R. Randall, was first appointed to the authority on September 20, 1937, by the Hon. Robert C. White, then controller of the city, and, by successive appointments, continued in office until September 20, 1944, when he was reap-

pointed for a further term of five years, which does not expire until 1949. The present controller, Hon. Frank J. Tiemann, on June 21, 1946, requested defendant's resignation from the authority, and, upon Randall's refusal to do so, the controller sent him a formal notice of dismissal on June 24, 1946. In taking this action Controller Tiemann claimed to be acting under authority of article VI, sec. 4, of our Constitution, which provides that "appointed officers, other than judges of the courts of record and the Superintendent of Public Instruction, may be removed at the pleasure of the power by which they shall have been appointed".

On June 26, 1946, two days after dismissing Randall, the controller appointed relator, William Reinhardt, to fill the vacancy claimed to have been thus created, and since that time Messrs. Reinhardt and Randall have each claimed to be the only lawful holder of the office, both have been attending the meetings of the authority in assertion of their respective claims, and the present proceedings have been brought to settle that dispute.

At the hearing of the case by the full court a stipulation, agreed to by both parties, was offered in evidence by relator, in which it was factually agreed, subject to the right of defendant to object to its admissibility as competent and relevant evidence, that the Mayor of Philadelphia, if called as a witness, would testify that he had at all times "approved and concurred" in the action of the controller in removing defendant. It is clear, both from the stipulation and from counsel's statement in open court, that the mayor did not actually join, or in any manner participate, in the controller's attempted removal of Randall, which was done upon his asserted individual responsibility and authority as successor in office to Controller White. This stipulation, therefore, was merely an expression of the mayor's personal opinion "approving" the action taken by the controller, in which he in no manner offi-

cially participated. Whether his so-called "approval" is intended to be of the action itself, or of its legal validity, is not entirely clear, although from the stipulation as a whole it seems reasonably obvious that the latter is its intended meaning. In either event, it has no evidential value in the case. While entitled to respect as the opinion of the chief executive of the city, it cannot affect the legal question before us, which we alone, as a court, can resolve by the exercise of judicial judgment. The mayor's statement certainly cannot be viewed as a performance by him, in conjunction with the controller, of a constitutional power in the exercise of which they never joined, and as to which his so-called "approval" or "concurrence" was not expressed until long after the controller's action had become a "fâit accompli" and its validity or invalidity fixed and settled beyond recall. The statement being incompetent as evidence, we sustained defendant's objection to its admissibility, and, no other testimony having been offered at the hearing, the case is now before us for decision on the undisputed facts disclosed by the pleadings as outlined above.

These facts raise the single legal question whether, under article VI, sec. 4 of the Constitution, providing that "appointed officers . . . may be removed at the pleasure of the power by which they shall have been appointed", defendant, who is an appointee of the controller, is removable by him alone, or, as contended by defendant, only by the joint action of all those whose combined independent appointments operated to fill the entire membership of the authority. If the former, Randall's removal by Controller Tiemann was valid, and relator Reinhardt, who was appointed to succeed him, is entitled to judgment of ouster against him; if the latter, the writ should be dismissed.

Were this a case of first impression, we would have no hesitancy whatever in holding that the plain intendment of that section of the Constitution, which the Su-

preme Court has repeatedly characterized as unambiguous, is to preserve in the public interest, free from legislative interference or abridgement, the already existing and well-recognized right of the agency or power (whether it be an individual or a body) that actually appoints a public officer to remove him at pleasure; and hence, that the dismissal of defendant Randall by the controller and his appointment of relator Reinhardt were valid and effective. Defendant vigorously contends, however, that when appointments are made, as here, to membership on a board composed of a number of officers, each of whom is appointed by different and independently acting agencies, none of those so appointed can be removed except by the common and concerted action of all such appointing agencies: That is to say, that in such cases the word "power" as used in the Constitution contemplates a group of separate appointors acting as a putative board or body, only one of whom ever has any part in the actual appointment of each appointee, upon whose removal the body is required to act. In support of this contention defendant points to the case of Commonwealth ex rel. Kelley v. Sheridan et al., 331 Pa. 415, claiming that it directly rules this question in his favor; and it cannot be denied that an examination of the Sheridan case fully supports that claim. It is on all fours with the case at bar and under the rule of stare decisis would seem to be a binding precedent, especially as it is the pronouncement of our court of last resort upon the exact question before us. This, of course, is the general rule. It has been repeatedly held, however, that stare decisis does not apply to questions involving constitutional interpretation, and that it is the duty of a court, when called upon to interpret and enforce a constitutional mandate, to carefully reëxamine the whole question, including previous decisions, and to decline to follow those which it is impelled to conclude are not in accord with the true spirit and intent of our

fundamental law: Armstrong et al. v. King, 281 Pa. 207; Heisler v. Thomas Colliery Co. et al., 274 Pa. 448; Commonwealth ex rel. Margiotti v. Lawrence et al., 326 Pa. 526; 1 Cooley, Constitutional Limitations (8th ed. 1927) 121, and notes. As was said in the last of the foregoing citations:

"When a question involving important public or private rights, extending through all coming time, has been passed upon on a single occasion, and which decision can in no just sense be said to have been acquiesced in, it is not only the right, but the duty, of the court, when properly called upon, to re-examine the questions involved, and again subject them to judicial scrutiny. We are by no means unmindful of the salutary tendency of the rule stare decisis, but at the same time we cannot be unmindful of the lessons furnished by our own consciousness, as well as by judicial history, of the liability to error and the advantages of review."

It is true that, in the cases above cited, the Supreme Court was speaking of a reëxamination by itself of its own previous decisions, and in this respect, those cases are not direct authority for a lower court declining to follow the decision of an appellate court on constitutional questions. How far then, if at all, may a lower court do so, if it is convinced, as we are here, that a single recent decision of the court of last resort has given an interpretation to the Constitution which, if blindly applied, would result in denying to the litigant before it what the lower court is impelled to conclude is his true constitutional right?

This poses a delicate question, the answer to which is by no means free from difficulty. If the rule of stare decisis has no place in constitutional interpretation, it would seem altogether logical that in every step of a litigation the court that is called upon to consider such a question, whether it be an upper or lower court, must

be free to determine and apply the correct law, as it sees it, to the case. Otherwise it would not be performing its whole duty as a court having jurisdiction to decide the matter, and, to the extent it fails to do so, it would not be administering full and exact justice. In deciding a case before it a court must necessarily have at its disposal all the rules and principles of law applicable to it. On the other hand, the power of a lower court to disregard an appellate precedent is far from absolute, and should, we think, be exercised with the utmost caution and reserve, and only if the circumstances are such that to refrain from doing so would be likely to work a direct and immediate public or private injury that could not be wholly averted by an appeal. As there does not appear to be any such danger in the present case, we prefer to follow the ruling in the Sheridan case, and to refuse the writ of ouster, notwithstanding we do so with much reluctance, as we have been unable logically to accept the reasons given for that decision.

In these circumstances, we take it to be not only our right, but our duty, to the parties and to the appellate court, with which we are in regretful disagreement, to state fully and candidly the considerations which have impelled us to the conclusion just indicated. The Sheridan case, which resulted in a judgment of ouster, was decided upon the following facts: Two acts of the legislature passed in 1937 reorganizing the board of revision of taxes in counties of the first class, provided that the board should be composed of seven members, three to be appointed by the county treasurer, three by the county controller, and the seventh by the joint action of the controller and treasurer. At the time the Sheridan case arose, however, and as a result of the decision of the Supreme Court in Suermann et al. v. Hadley, 327 Pa. 190, the board was actually composed of two members appointed by the controller, two by Treasurer Hadley and three by the judges, under ear-

lier legislation. Treasurer Hadley's appointees, Messrs. Breitinger and Byles, held office until dismissed by the succeeding treasurer, Luther Harr, who appointed Messrs. Sheridan and Shovlin in their places. A proceeding in quo warranto was then brought against the new appointees, in which a majority of the Supreme Court held on appeal, in an opinion by Chief Justice Kephart, that under article VI, sec. 4 of the Constitution, the treasurer alone could not remove his own appointees, but that they could be removed only by the joint action of all those whose appointments contributed to filling the entire board membership. In so holding, the court said (p. 419) :

"When the framers of the Constitution used the words 'the power by which they shall have been appointed' they were contemplating a single power to fill an office, here the Board of Revision, though the power might be exercised by two or more agents or appointers contributing jointly or severally to the ultimate result. The exercise of the power may be divisible, but it is nevertheless a single power. When appointment takes place under these circumstances, the segments of power are brought together as the power exercised by each office in compliance with the legislative intent, that is, the power of appointing the Board of Revision of Taxes. Giving to the Constitution its full effect, the power of removal must be the same power, namely, the joinder of all of the elements or parts of the appointive power. When these men are chosen by several appointive offices or agencies, qualify and take their places on the Board, they are not the individual representatives of the several offices. Their individuality as reflected by the particular office which selects them disappears and is merged into membership in the Board. It is then the Board that is acting, and when the Board with the four members added under the recent Act is to be broken down, by removals, if that is possible, it requires the action of the whole

appointive power made up of the several segments or elements. At this time, taking the Board as a whole, part of the appointive power was exercised by the judges by virtue of prior laws.

"What we hold is that while the individual offices severally make up the appointing power, when that power is once exercised and the appointees are installed, they lose their character as appointees of the individual offices and become the objects of the entire appointive power, which means the consolidation of all the elements of which it is composed. To remove these members from the Board requires the joint action of this appointive power. Without the action of all of these factors, any attempted removal by one of them is abortive."

The difficulty we find in accepting the foregoing reasoning is that it is grounded upon a failure to recognize the essential distinction between an officer and the office which he holds. By the words "appointed officers", the Constitution plainly refers to the incumbent individuals, not to the offices which they hold by appointment; and the right to remove at pleasure is preserved in the power "by which *they* (i. e. the officers) shall have been appointed"—not the power which shall have created the office. This distinction becomes clearer when we consider the case of a governmental body composed of a number of appointed officers. There the body has a continuing existence, regardless of the constantly changing identities of the individuals who make up its full membership. The office to which one is appointed in such circumstances is that of a member of the board (commission, authority, or however else it may be legally designated), not the board itself, which is never changed or abolished, but remains one and the same body, however often the composition of its membership may be wholly or partially altered by successive appointments or removals. It is true that the action of appointing and removing board officers,

especially when considered in connection with a change of all or a majority of them at the same time, is not infrequently referred to as the appointment or removal "of a board". Such a phrase may sufficiently serve as a practical method of suggesting the general idea of filling or changing a board's membership, but it certainly does not correctly express the true legal nature of the action to which it refers. Yet it is largely upon the adoption of that inaccurate colloquialism that the reasoning of the decision in the Sheridan case seems to be based.

Starting with the bare assertion that "neither the county controller nor the county treasurer alone could fill the board of revision, *which was the office*", the opinion proceeds to the logical conclusion, if this major premise is assumed to be correct, that "it required the collective efforts of all agencies exercising appointive selection to appoint the board. Of course, all appointing agencies must exercise their powers in order to *fill* the board, and also their powers of removal to completely change it. This is obvious. But since the board is not the office, it is a manifest non sequitur to infer therefrom that each individual membership on the board is, in contemplation of law, the object of the appointing power of all the appointing agencies. Nevertheless, from this premise, the opinion then holds that, as soon as an individual officer of the board is appointed and assumes office, he ceases to be the appointee of the agency that appointed him, and becomes, either what in fact he never was, the appointee of a group consisting of all the agencies, or the personification of the board considered as an office. We confess it impossible for us to follow this reasoning. It seems to us neither true in fact, nor a conception which the plain citizen, whose understanding is the cardinal guide to constitutional interpretation, would gather from the simple words: "Appointed officers may be removed at the pleasure of the power by which they shall have been

appointed." To say that, if A alone appoints B, A is not the power that appoints him, but only a "segment" of that power, because C and D also appoint other persons to other offices on the same body, is not only misleading, but also positively fallacious. Dialectic subtleties are beyond the capacity of both the framers of a Constitution and the people who ratify it. The truth is that this heretofore unheard of and fictitious body, which has been conjured up by the Sheridan decision, is nothing but a figment of interpretive imagination.

Enough has been said, we think, to indicate the difficulties that preclude a logical acceptance of the principle laid down in the Sheridan decision. Turning then to a consideration of the practical results of that decision, we find our difficulties enormously multiplied. The opinion attempts to justify the interpretation given by it to the Constitution on the ground that, "to make this difficult piece of legislation workable . . . we find this to be the only sensible and possible interpretation"; and that "any other conclusion" would produce "an absurd result". That this is manifestly unsound can be readily demonstrated.

Apart from the bald assertion of the existence of a body, or power, made up of a number of appointing "segments" or "agencies" we are given no guide by which its composition and operation can be fairly recognized. Hence it may properly be asked: What is this novel body that is never to appoint, but only to remove at pleasure? What is its composition? Is it always to be composed of all the agencies having power to appoint to a board, or, if vacancies exist, is it to consist only of those agencies that have appointees actually serving on the board? Nothing even suggests the answer to this important question. Does it function as individuals, or as a group of entities? Must it act unanimously, or by a majority of its constituent elements?

Are its attributes so vague and tenuous that it is barren of actual or legal apperception? In short, what is this strange and shadowy shape, without constitutional or legal form and definition:

> "If shape it might be call'd, that shape had none
> Distinguishable in member, joint, or limb,
> Or substance might be call'd that shadow seemed,
> For each seemed either?"

Passing over the general problem of how such removing bodies should be composed in differing circumstances, and assuming as is the case here, that all the offices on the housing authority are filled, the appointing power is composed of six individuals, the mayor, the controller and the four members appointed by them, who in turn appoint the fifth member by, it may be presumed, a majority vote. If they must act individually and unanimously, a single vote would prevent any removal, and thus the power of removal at pleasure, which article VI, sec. 4 of the Constitution is designed to preserve in the public interest, is practically destroyed. Again, if they act individually, but by a majority vote, three of those in office could block any removal, and perpetuate themselves in defiance of the wishes even of the very persons who appointed them, since a motion to remove a member would fail of passage on a tie vote.

Assuming, on the other hand, that the removing power be made up of the separate appointing entities, acting in the same manner in which they appoint, it would consist of three appointers: (1) The mayor, (2) the controller, and (3) their four appointees (functioning by a majority vote). In that case, a combination of any two entities could prevent the removal of a member appointed by the third; again practically nullifying the constitutional purpose.

Startling as these results are if we consider merely the potential nullification of the power to remove those already in office, they become still more startling and dangerous when we contemplate the effect of an af-

firmative exercise of that power upon the concededly exclusive right of each entity to appoint. That also can be utterly destroyed, for, the moment it is exercised, the new appointee can be removed at the pleasure of a combination of the other appointing entities. For example, the power to appoint two members given by the Housing Authority Act to the controller could be completely and permanently thwarted by the immediate removal of his successive appointees by persons who have no right whatever to participate in their selection. Such a result is inherent in the interpretation given to article VI, sec. 4 by the Sheridan decision, and, it seems to us, demands a careful reëxamination of the whole question for this reason alone. We have pointed out only a few of the difficulties, uncertainties and confusions created by the interpretation given to article VI, sec. 4 by the Sheridan decision. They are sufficient, however, to indicate the utter unworkability of the rule there laid down. Why, then, should the simple, long-standing, easily understood and easily applied rule that "he who appoints may remove at will" be cast aside in favor of one whose only virtue lies in its capacity to create doubt and confusion and to obstruct or altogether nullify the operation of a salutary provision of the Constitution? Surely the rule of statutory construction which presumes that the legislature never intends an absurdity should apply with even greater force to the interpretation of the Constitution.

Although all the parties agree that the office here under consideration is within the constitutional provision (Georges Township School Directors, 286 Pa. 129; Commonwealth ex rel. v. Hiltner, 307 Pa. 343; Kraus v. Philadelphia, 337 Pa. 30; Commonwealth ex rel. Houlahen v. Flynn, 348 Pa. 101), it may be noted, in conclusion, that the suggestion contained in the last paragraph of the opinion, that the Constitution may not have been "meant to apply to the novel situa-

tion created" by the act then under consideration, does not contribute to a satisfactory solution of our problem. The right of the appointing power to remove appointed officers at pleasure is not the exclusive creation of the Constitution. It existed at common law, has always been a part of our legal system, and the Constitution merely recognizes the right and protects it from legislative interference or abridgment. In Glessner's case, 289 Pa. 86, 90, Mr. Justice Frazier said:

"Under the common law it is the rule that the tenure of ministerial officers in general is during the pleasure of the appointing power, unless the law clearly provides otherwise. 'An officer is not appointed for his own sake, but for that of the public. If he misbehaves, the sooner he is removed the better, because the country suffers every moment that he continues in office. . . . Never was it supposed, in Pennsylvania, either before or since the revolution, that it was proper for ministerial officers to hold by any stronger tenure than the pleasure of the persons through whom they received their appointment, except in special cases where by law it was provided otherwise. This long continued custom is powerful evidence of the law; particularly in the United States, where every freeman stands on the same proud footing, where offices are sought with avidity, and where there is neither inclination to submit to executive oppression, nor danger in resisting it': Com. v. Bussier, 5 S. & R. 451, 461."

The legislature having failed to provide any special method of removing officers appointed to the housing authority, the problem before us remains the same, whether it be viewed from the standpoint of the general law or of article VI, sec. 4 of the Constitution.

Holding the above views, we have been strongly inclined to decide this case accordingly, notwithstanding Commonwealth ex rel. Kelley v. Sheridan, 331 Pa. 415. That case, however, is directly in point, and so clear and definite in its ruling, that to hold the law to

be otherwise would amount to a deliberate refusal to recognize what has been definitely declared to be the law by our Supreme Court. As we have already pointed out, stare decisis is not inflexible in constitutional interpretation. It still has its force there, however, and we think it the more decorous and orderly procedure to formally follow, in the instant case, the appellate precedent, leaving any modification that should be made of its own decision in the Sheridan case to the wisdom and sound judgment of the court that rendered it.

Accordingly, judgment of ouster is refused, and the petition and writ dismissed.