### COFFIN et al. v. CITY OF INDIANAPOLIS et al.

(Circuit Court, D. Indiana. January 6, 1894.)

No. 8,888.

1. EQUITY JURISDICTION—BANK DEPOSITS.
   Plaintiffs, being successful bidders for an issue of city bonds, deposited a sum of money in a bank, and took a certificate of deposit, payable to the city officials. The money was to be returned on the completion of the purchase, and to be forfeited in case plaintiffs failed to complete it. Plaintiffs, however, discovered that the bonds were invalid, and sued the city and the bank to obtain a return of the certificate, and a decree entitling them to the money. *Held*, that the suit was cognizable in equity.

2. MUNICIPAL CORPORATIONS—POWERS—BONDS.
   Power to issue bonds to replace in the treasury money already used in paying prior bonds is not conferred by a grant of authority to issue "refunding bonds" or original bonds to procure money for use in the "legitimate exercise of the corporate powers," and for the payment of legitimate corporate debts.

3. SAME.
   Where a number of bonds, purporting to be "refunding bonds," are issued as one series, but part of them are not in fact refunding bonds, and are illegal, their illegality attaches to the whole issue; and one who bids for them as refunding bonds cannot be compelled to take even the amount that might have been legally issued.

4. CONTRACT—CONSTRUCTION—BID FOR "REFUNDING BONDS."
     One who, pursuant to an advertisement of sale, makes a bid for municipal "refunding bonds," cannot be required to take part of the amount in other bonds, though equally valuable.

In Equity.   Suit by William Edward Coffin and Walter Stanton against the city of Indianapolis and the Merchants' National Bank of Indianapolis.   Heard on demurrer to the bill.   Overruled.

Miller, Winter & Elam, for complainants.
John E. Scott and Elliott & Elliott, for defendants.

BAKER, District Judge.   The questions for consideration are presented by the demurrer interposed by the city of Indianapolis to the bill of complaint.   The complainants, after showing the requisite diverse citizenship of the parties, allege, in substance:   That they are bankers and brokers, doing business in the city of New York, and as such are dealers in municipal bonds and other securities.   That, by the charter of the city of Indianapolis, provision is made for the borrowing of money, the making of loans, and the selling of bonds, as follows:

"Sec. 30. The common council shall have power to borrow money to an amount not exceeding two (2) per cent. of the taxable property of such city, as the same may appear on the tax duplicate of such city for the year in which such loan shall be effected; provided, that the entire money borrowed shall not at any time exceed two (2) per cent. of the taxable property of such city.   Such loans may be made only for the purpose of procuring money to be used in the legitimate exercise of the corporate powers of such city, and for the payment of legitimate corporate debts.   Sec. 31. Such ordinance for loans may authorize the issuance of bonds or other city obligations, negotiable or not, bearing interest at a rate not exceeding six (6) per cent., and running not to exceed thirty years.   Such ordinances shall provide for the time and manner of advertising the sale of such bonds or other securities, and of the receipt of bids for the same, together with the mode and terms of sale.   All duties with regard to the preparation, advertisement, negotiation, and sale of such bonds and other securities shall be performed by the head of the department of finance.   Said officer, after causing such bonds to be properly executed, shall deliver the same to the city treasurer, taking his receipt therefor, and, upon the conclusion of the contract for the sale of such bonds or other securities, shall certify to the treasurer the amount which the purchaser is to pay for the same, together with the name of the purchaser.   And thereupon it shall be the duty of the treasurer to receive from the purchaser the amount so certified, by the head of the department of finance, and to deliver the bonds or other securities to the purchaser, taking his receipt therefor. The treasurer and the head of the department of finance shall thereupon each make a report of his proceedings to the mayor.   Sec. 32. Temporary loans may be authorized by ordinance of the common council in anticipation of the revenue of the city for the current and following year, and payable within that period, but the aggregate amount of such temporary loan in any fiscal year shall not exceed the amount of the city levy for the same year.   No temporary or other loan upon the revenue of any current or succeeding year shall be made until all temporary loans upon the revenue of any preceding year shall have been fully paid.   Sec. 33. The common council shall have power to authorize the issue and sale of refunding bonds, in order to raise money to take up any outstanding bonds of such city, or to exchange with the holders of such outstanding bonds.   The same shall be governed by the provisions of the second preceding section, so far as the same are applicable.   Sec. 34. No order or warrant shall be drawn against the funds of such city, in the hands of the treasurer, or other officer, unless an appropriation has been

made by ordinance of money for such purpose which is not exhausted, or unless the same shall be for a salary fixed by statute, or ordinance, or for the payment of any judgment which such city is compelled to pay. Sec. 35. All bonds or other city securities offered for sale, pursuant to the provisions of this act, may bear annual interest not exceeding six (6) per cent., may run not longer than thirty years, and may contain an option allowing such city to redeem the same at earlier specified dates, in whole or in part, if so directed in the ordinance authorizing such issue."

That on the 24th day of May, 1893, said city was indebted in the principal sum of $600,000, evidenced by 600 bonds of $1,000 each, to become due and payable July 1, 1893. That on or about April 1, 1893, said city was indebted in a certain other sum of $21,000, evidenced by 21 other bonds, of $1,000 each, known as the "Sellers Farm Issue" of bonds, which $21,000 of bonds were by said city, on April 1, 1893, duly paid, discharged, and canceled, so that after that date the same were no longer an indebtedness of the city. That on the 23d day of May, 1893, an ordinance known as "General Ordinance 30, 1893," was enacted by the common council of said city, and approved by the mayor. The ordinance authorized the head of the finance department to refund certain of the indebtedness of the city, amounting to $600,000, represented by certain outstanding bonds, known as "Series A" and "Series B," which would become due July 1, 1893; "and to issue and sell bonds of said city to replace in the treasury the sum of $21,000, used in paying the bonds of said city, known as the "Sellers Farm Issue," which became due April 1, 1893. The head of the finance department was authorized, for the purpose of refunding said indebtedness, and replacing in the city treasury said sum of $21,000, to prepare and sell 621 bonds of the city, of $1,000 each, which should bear the date of July 1, 1893, and should be designated "Indianapolis Refunding Bonds of 1893." The head of the finance department was required to advertise for bids for the sale of said bonds. It was ordered that the city comptroller should award such bonds, or, if he should see fit, a part thereof, to the highest and best bidder therefor, and that he should have the right to reject any and all bids or proposals, or any part thereof, and should have the right to accept a part of any bid, he being the sole judge of the sufficiency or insufficiency of any bid. It was further ordered that the person to whom the bonds, or any part thereof, should be awarded, should, within 10 days thereafter, deposit with the city comptroller a certified check on some reliable bank, payable to the order of the treasurer of said city, for a sum equal to 5 per cent. of the face of the bonds so awarded; and that said check should, upon the completion of the sale of the bonds for which it was deposited, be returned to the successful bidder; and, in case the successful bidder should fail to complete the purchase of the bonds so awarded, he should forfeit the check so deposited to the city. That on May 24, 1893, the city, in pursuance of said ordinance, caused public notice to be given that sealed bids would be received by said city until Friday, May 26, 1893, at 9 o'clock A. M., for the whole or any part of said $621,000 of bonds of said city; said notice being as follows:

"$621,000.

"Refunding Bonds of the City of Indianapolis.

"Department of Finance, Office of the City Comptroller.

"Indianapolis, Ind., May 24, 1893.

"Sealed bids will be received by the city of Indianapolis, Indiana, until Friday, May 26, 1893, at 9 o'clock A. M., for the whole or any part of $621,000 refunding bonds of said city, to be dated July 1, 1893. Said bonds will be of the denomination of $1,000 each, with coupons attached; will draw interest at the rate of 4½ per cent. per annum, payable semiannually, on the 1st day of January and July; the principal payable in thirty (30) years, without option, and both principal and interest payable at the office of Winslow, Lanier & Co., New York. These bonds are issued for the purpose of taking up $600,000 of city bonds due July 1, 1893, and to put back into the city treasury $21,000, paid out to redeem bonds due April 1, 1893. Bids for the purchase of said bonds should be indorsed 'Proposals for Refunding Bonds,' and directed to the city comptroller, Indianapolis, Indiana. The proposals will be opened May 26, 1893, at 9 o'clock A. M., and the bonds awarded to the highest and best bidder, the city reserving the right to reject any and all bids. Successful bidders will be required within ten days from the date of the award to deposit with the city comptroller a certified check on some reputable bank, payable to the city treasurer, for 5 per cent. of the face value of the bonds awarded, as an earnest of good faith, which check would be returned to the maker should the bonds be taken up at the proper time; otherwise, it will forfeit to the city. The bonds will be delivered at the office of Winslow, Lanier & Co., New York, July 1, 1893, and must be paid for on that day.                  William Wesley Woolen, Comptroller."

That complainants presented to said city a bid for said bonds, as follows:

"We will purchase $621,000 city of Indianapolis 4½ per cent. thirty-year refunding bonds, or as many as you can legally issue, and pay par for the same.                                        Coffin & Stanton."

That the complainants were the highest and best bidders, and thereupon said $621,000 of bonds were awarded to them by said comptroller. That on May 26, 1893, the complainants, assuming that it would be shown that all of said bonds were refunding bonds and were legal, deposited with the Merchants' National Bank of Indianapolis, Ind., the sum of $31,050, being 5 per cent. upon said sum of $621,000, the total amount of said bonds then and there so assumed to be awarded to complainants, and received therefor a certificate of deposit, bearing date May 26, 1893, payable to the order of the city treasurer of said city, and delivered the same to the comptroller of said city, who was the head of the department of finance, said deposit being made as an earnest of good faith, and the same was received and is now held by said city. That the entire amount of $621,000 of bonds so proposed to be issued and sold were prepared and executed, ready for delivery, as a single series, no discrimination being made as to any particular part being used for any particular purpose, but all consisting of a single loan for the purpose of refunding the $600,000 of outstanding bonds, and for replacing in the city treasury the sum of $21,000, which had been long before paid out in the extinguishment of said Sellers farm bonds. That the complainants are advised by counsel, and upon such advice charge the fact to be, that said issue of bonds is not legal, for the reason, among others, that said city had no authority

under its charter to issue bonds for the purpose of replacing moneys in the treasury which had theretofore been paid out in the legitimate expenses, or in the discharge of the legitimate debts of the city. That the charter does not contemplate the making of loans and the selling of bonds for such purpose. That the replacing of funds in the treasury which have been used in the discharge of former obligations of the city is not a legitimate exercise of corporate powers, or the payment of legitimate corporate debts; and that by reason of the fact that said bonds for refunding purposes, and for replacing said money in the treasury, are in a single issue, undistinguishable as to identity or purpose, the entire series is illegal, unauthorized, and invalid. That when the complainants made their bid, and until they discovered and were advised of said illegality, they were at all times ready, willing, and anxious to take said bonds, and were prepared to do so. That said city insisted and insists that said issue of bonds is regular, legal, and said bonds valid refunding bonds, and that complainants were and are bound by their bid to accept and pay for the same; and that, complainants having declined so to do, the city claimed and is now insisting upon a forfeiture of said money so deposited with said Merchants' National Bank. That, in pursuance of said policy, the city has presented said certificate of deposit to the Merchants' National Bank, and demanded payment of the same. That said bank is ready, willing, and able to promptly pay said certificate of deposit, but has declined to pay the same to said city because complainants, upon the discovery of such illegality in the issue of said bonds, notified the bank that it must not pay such certificate, and that the same would be and was claimed to be the property of complainants. That the bank is merely a stakeholder as between the parties, having no interest in said controversy, and is only deterred from paying said certificate of deposit by the dispute between said parties. That said certificate of deposit is in the custody of the city, and for that reason complainants are unable to set out a copy of it, but aver that it is in the usual form, and calls for the payment of the sum of $31,050, on its return to the bank properly indorsed. That complainants have called on the city to surrender said certificate of deposit to them, but said city refuses, and pretends and claims that it, and not the complainants, is entitled to the same, and to the moneys represented by it, and is demanding payment thereof. That said bank is reluctant to withhold payment of the certificate after demand made, and there is danger that said city may transfer said certificate, which is negotiable paper, to some person not cognizant of the facts, who may take the same for value, and obtain an equity for the payment of the money. As these complainants are informed and believe, and therefore charge, that said city has threatened to so transfer the same, and is now threatening to sue said bank on said certificate. That such suit by the city against the bank would not settle the controversy between the city and the complainants, but would result in the necessity for more suits, and the payment of the money to the city would subject the complainants to great inconvenience and irreparable damage. That all said actings and

doings are in violation of complainants' rights, and contrary to equity and good conscience. The prayer is that the city be required to show why it should not surrender said certificate to complainants; that complainants be decreed to be entitled to the same, and to the moneys called for therein; that, pending the litigation, the city be enjoined from transferring or disposing of said certificate otherwise than to complainants, and from commencing any suit to collect said certificate; that said bank be enjoined from paying the same to the city or other party than complainants; and for all such further relief as may be proper in the premises.

It is insisted by the solicitor for the city that the complainants have a plain, adequate, and complete remedy at law, and for this reason their bill ought to be dismissed. It is argued that an action for money had and received would lie against the city to recover the money in question. It is doubtful whether the complainants could maintain such an action against the city upon the facts disclosed in the bill. It is not necessary, however, to decide this question, as, in my opinion, the bill of complaint is sustainable in equity. It shows that the complainants deposited with the Merchants' National Bank the sum of $31,050, and received a certificate of deposit therefor, which was made payable to the treasurer of the city of Indianapolis; that the complainants delivered the certificate of deposit to the city comptroller to secure the performance of their bid for the purchase of the $621,000 of city bonds; that it was agreed that the certificate of deposit should be returned to complainants upon their compliance with the terms of their bid; and, upon their failure to do so, that it should become forfeited to the city. It is alleged that the complainants have at all times been ready and willing to perform the terms of their bid, but that the city has not and cannot perform its part of the contract. It is also alleged that the city, notwithstanding its default, has demanded of the Merchants' National Bank that it pay to it the money evidenced by said certificate of deposit, and is threatening and intends to compel the payment thereof to it. The city is the payee named in the certificate of deposit, and it thus has the legal title to the money. Its legal title, however, as between itself and the complainants, is open to inquiry. The sum of $31,050 deposited with the bank was the money of the complainants, and in equity it continued to belong to them until their equitable right and title thereto should become forfeited to the city by failure to comply with the terms of their bid. The attempt of the city to gain possession of the money before the complainants were in default was in plain violation of their equitable rights in the money so deposited. The complainants were under no obligation to wait until the city had consummated its threatened wrong, but had a clear and undoubted right to invoke the aid of a court of equity to prevent the wrong, and to reclaim the money so belonging to them in equity and good conscience, and to compel the city to redeliver to them the certificate of deposit. Both the city and the bank are necessary parties to enable the court, in a single suit, to award the complainants the full measure of relief to which they are entitled. The suit is

one to determine the title to a fund between the holder of the legal title and the equitable owner, and the bank is a necessary party to enable it in safety to pay the money to the equitable owner, without the presentation of the certificate of deposit. A suit in equity is not only the proper, but it is the only appropriate, proceeding to determine the rights of an equitable claimant of a fund against the holder of the legal title. In the present case the complainants are the equitable owners of the money on deposit in the Merchants' National Bank, and they allege facts which, if true, show that the city has not now, and never can acquire, any right to the fund in controversy. The city's assertion of a right to the fund is inequitable, and in plain violation of the terms of the contract by virtue of which it received the certificate of deposit. The complainants are not required by any rule of law or by any principle of fair dealing to permit the city to withdraw the money from the bank by the wrongful use of the certificate of deposit which it holds. A court of equity is the proper one to prevent the threatened wrong, and to determine the ultimate rights of the parties to the fund in controversy.

The city advertised for proposals for the purchase of $621,000 refunding bonds. The complainants' bid was for refunding bonds. The bid was in these words:

"We will purchase $621,000 city of Indianapolis 4½ per cent. thirty-year refunding bonds, or as many as you can legally issue, and pay par for the same. Coffin & Stanton."

This bid was accepted, and the city awarded to complainants the whole $621,000 of bonds, as refunding bonds which it could lawfully issue. The complainants, acting upon the award, as constituting an award of $621,000 of refunding bonds, which could lawfully be issued as such, deposited the money in controversy with the Merchants' National Bank as an earnest of their good faith. "It is a general and undisputed proposition of law," says Dillon, (1 Dill. Mun. Corp. § 89,) "that a municipal corporation possesses and can exercise the following powers, and no others: First, those granted in express words; second, those necessarily or fairly implied in or incident to those essential to the declared objects and purposes of the corporation, not simply convenient, but indispensable." It is the settled law of Indiana that a city organized under the law of the state cannot issue and sell its bonds, to raise money by way of loan, unless expressly authorized so to do. City of Aurora v. West, 22 Ind. 88; State v. Hauser, 63 Ind. 155; Rushville Gas Co. v. City of Rushville, 121 Ind. 206, 23 N. E. 72. Such, also, is the settled doctrine of the supreme court of the United States. Brenham v. Bank, 144 U. S. 173, 12 Sup. Ct. 559. And, in case of doubt touching the existence of the power on the part of a city to issue and sell its bonds to raise money by way of loan, such doubt must be resolved against the existence of the power. See authorities supra. As illustrating the strictness with which municipal powers to contract a bonded debt are construed, it has been held that under a power to subscribe for stock, and to borrow money to pay for the

same, an issue and exchange of bonds for the stock are not authorized. Scipio v. Wright, 101 U. S. 665; Horton v. Town of Thompson, 71 N. Y. 513. The power of the city to issue and sell the bonds in question, if it exists, must therefore be found in the above-quoted provisions of its charter. Section 30 authorizes the making of original time loans, not exceeding 2 per cent. of the taxable property of the city. It provides that such loans "may be made only for the purpose of procuring money to be used in the legitimate exercise of the corporate powers of such city, and for the payment of legitimate corporate debts." Section 31 provides the details of loans, such as the character of bonds, manner of issue and sale, rate of interest, and the like. Section 32 provides for temporary loans, and plainly has no bearing on the present controversy. Section 33 provides for the issue and sale of refunding bonds. It is the only section which authorizes such bonds, and it clearly defines the purpose for which they may be issued:

"Sec. 33. The common council shall have power to authorize the issue and sale of refunding bonds, in order to raise money to take up any outstanding bonds of such city, or to exchange with the holders of such outstanding bonds. The same shall be governed by the provisions of the second preceding section, so far as the same are applicable."

Section 34 forbids the drawing of warrants on the funds of the city except for certain specified purposes. Section 35 limits the rate of interest and the time for which bonds may be issued. In view of the language of section 33, there is no room for doubt in regard to the securities embraced by the words "refunding bonds." The language of the statute contains its own interpretation. Refunding bonds are of two sorts: First, those which are issued and sold to raise money to take up outstanding bonds of the city; or, second, those which are issued by the city to the holders of its outstanding bonds in exchange therefor. By the express terms of the statute, refunding bonds cannot lawfully be issued for any other purpose. Six hundred of the bonds, of $1,000 each, awarded to the complainants, were to be issued and sold to raise money to pay off and take up a like amount of the outstanding bonds of the city. To this extent, and for this purpose, the city had the undoubted authority to issue and sell its bonds. The contention is that 21 of the bonds of $1,000 each, constituting an integral and undistinguishable part of the 621 refunding bonds awarded to complainants, are not refunding bonds, and are not within the terms of their bid and of the award made by the city. It is further contended that the city had no power to issue and sell the 21 bonds included in its contract with complainants, because the bonds were to be issued and sold for a purpose not authorized by its charter. The bill alleges:

"That on or about the 1st day of April, 1893, said city was indebted in a certain other sum of $21,000, evidenced by twenty-one bonds of said city, of $1,000 each, known as the 'Sellers Farm Issue' of bonds, which $21,000 of bonds were by said city, on said 1st day of April, 1893, duly paid, discharged, and canceled, so that after that date the same was no longer an indebtedness of said city."

It is further alleged that the—

"Entire amount of $621,000 of bonds so proposed to be issued and sold by said city were prepared and executed ready for delivery, and were so executed as a single series, no discrimination being made as to any particular part thereof being used for any particular purpose, but all consisting of a single loan, for the purpose of refunding the $600,000 of outstanding bonds, and for replacing in the general treasury of said city the sum of $21,000, which had been, as above stated, long before paid out from said general treasury in the extinguishment of said Sellers farm bonds."

The Sellers farm bonds, having been duly paid, discharged and canceled, ceased to be outstanding bonds of the city. Having ceased to exist, the city possessed no lawful power to issue and sell bonds in order to raise money to take them up. It follows, therefore, that the bonds in question, to the amount of $21,000, are not refunding bonds. Not being refunding bonds, they are not within the terms of the complainants' bid, nor the city's award. The complainants had an undoubted right to stand upon the terms of their bid, and refuse to accept any bonds unless they were the refunding bonds of the city. Refunding bonds stand upon a different, and often a more secure, foundation than bonds issued for an original loan. The bonds to be refunded were issued before there was any limitation on the amount of the issue, and would therefore, when refunded, not be subject to that limitation. Aetna Life Ins. Co. v. Lyon Co., 44 Fed. 329. And, if there were irregularities in the refunding issue, the holders of the refunding bonds might be subrogated to the rights of the holders of the original bonds. But it is sufficient to say that a court of equity has no power to compel the complainants to accept any bonds, although equally valuable, which are not embraced within the terms of their bid. The 21 bonds in question were not refunding bonds. If issued as refunding bonds, they would have been ultra vires and void. And, in my opinion, these bonds would have been invalid as original bonds. Section 30 of the charter provides for the making of original loans, and concludes with this limitation of power:

"Such loans may be made only for the purpose of procuring money to be used in the legitimate exercise of the corporate powers of such city, and for the payment of legitimate corporate debts."

This limitation evidently means that, when the city proposes to borrow money, the ordinance shall state the purpose of the loan, in order that it may appear that the money procured is to be used in the legitimate exercise of corporate powers, or for the payment of legitimate corporate debts. If the city may issue and sell its bonds to raise money without stating any lawful purpose for which the money is to be used, then the bonds would be valid if the money was used for a legitimate corporate purpose, and invalid if the money was illegitimately used. Such a construction would place upon the purchaser of the bonds the burden of seeing to the rightful application of the money, if he would maintain their validity. The city, in the present case, has rightfully recognized the necessity of stating the purpose of the issue and sale of the bonds. Is the purpose stated as to $21,000 of the bonds a legitimate one?

As we have already said, these bonds were not to be issued and sold for the payment of a legitimate corporate debt, because there was no debt to be paid. The Sellers farm debt had been paid, and the bonds evidencing the same had been canceled and discharged. Thereafter the debt ceased to exist. Is the raising of money, by the issue and sale of bonds, for the purpose of putting back in the treasury a sum equal to what had been used in the payment of a debt of the city, "a legitimate exercise of the corporate powers of such city?" If the city may issue and sell its bonds to replace in the treasury the money paid out on account of the Sellers farm debt, it may issue and sell its bonds to replace in the treasury all the moneys ever paid out by it on account of its debts and liabilities. In my judgment, the issuance and sale of bonds for such a purpose is not within the scope of its legitimate corporate powers. The city cannot issue and sell its original bonds except for the purpose of raising money to pay some legitimate debt or liability, or to meet some future liability or obligation incurred, or to be incurred, in the legitimate exercise of its corporate powers. The bonds in question, to the extent of $21,000, must be held to be unauthorized and illegal.

It is insisted by the solicitor for the city that, conceding that the bonds in question, to the amount of $21,000, are illegal, the residue of them are legal and valid refunding bonds, and, therefore, that the complainants were bound to take them. In this, we think, the solicitor is in error. The award by the city and the acceptance by the complainants were of the $621,000 of refunding bonds. The bill shows that the city tendered all of the bonds in a lump, and demanded their acceptance, and threatened, upon failure to accept, to forfeit the entire deposit. The complainants refused to accede to the tender and demand, and rightfully. The complainants could not be in default in respect of the $600,000 of bonds, because they were never separately tendered to them. They could not accept what was never offered. But, if they had been separately tendered, complainants were not bound to accept them. Their bid and the city's award were of $621,000 of refunding bonds. They had a right to stand upon the terms of the contract, and could not be compelled to take either more or less than $621,000 of the bonds. The bonds were all of one series. Each one was as much a refunding bond as any other, and each one was as much a bond for replacing money in the treasury as any other. If, then, to the extent of $21,000, they were tainted, the taint permeated the entire issue, because the legal were incapable of discrimination from the illegal. This is not a case where bonds partly legal and partly illegal have been placed upon the market, and purchased by parties in good faith. In such a case it is the duty of the court, in furtherance of justice, to uphold such bonds to the extent that it may have been lawful to issue them, and to hold invalid only the excess. Here the question is raised before the bonds are issued. The real question for decision is, will a court of equity compel a purchaser to consummate his bid and pay for bonds, where a part of the issue is illegal? A court of equity will not lend its aid to consummate an

illegal or unconscionable transaction. It would be unjust and inequitable to compel the complainants to take bonds, a portion of which are illegal. The illegality is of such a character as to preclude the city from carrying out the terms of its contract. It is the duty of the court in such a case to relieve the party not in default by restoring the status quo. This can only be done by ordering the return of the certificate of deposit, and requiring the bank to pay the money to complainants. From these views it follows that the demurrer must be overruled, and it is so ordered.