Montgomery, Jr. *v.* Martin et al., Appellants.

26

Argued June 30, 1928. Before MOSCHZISKER, C. J., FRAZER, WALLING, SIMPSON, KEPHART, SADLER and SCHAFFER, JJ.

*Wm. A. Schnader,* Special Deputy Attorney General, with him *Thos. J. Baldrige,* Attorney General, for appellant.—The section in question was in derogation of legislative power. Had it been omitted from the Constitution, the legislature would have been free to create debt without restriction: Russ v. Com., 210 Pa. 544, 554; Norris v. Clymer, 2 Pa. 277, 285; Sharpless v. Phila., 21 Pa. 147, 161; P. R. R. v. Riblet, 66 Pa. 164, 167.

"Debt," as used in this section of the Constitution, has never been expressly defined; but "debt," as used in article IX, section 8 (which limits municipal indebtedness), was defined in Keller v. Scranton, 200 Pa. 130.

This language was quoted with approval in Lesser v. Boro., 237 Pa. 501, 507.

The courts should not be astute to limit legislative power by drawing fine distinctions between expressions used in constitutional provisions.

All presumptions favor a broad interpretation of the constitutional provisions under discussion: Russ v.

Com., 210 Pa. 544; Norris v. Clymer, 2 Pa. 277; Sharpless v. Phila., 21 Pa. 147; P. R. R. v. Riblet, 66 Pa. 164; Com. v. Snyder, 279 Pa. 234.

*Owen J. Roberts,* for appellee.—No forced or unreasonable construction is to be put on the language of the Constitution: Com. v. Snyder, 261 Pa. 57; Etter v. McAfee, 229 Pa. 315; Maginnis v. Schlottman, 76 Pa. Superior Ct. 124.

This particular amendment must be more strictly construed than is usual in the construction of State constitutions: Com. v. Mathues, 210 Pa. 372; Pittsburg v. R. R., 205 Pa. 13; U. S. v. Dickinson, 40 U. S. 141; Ryan v. Carter, 93 U. S. 78; Perry Co. Tel. & Tel. Co. v. Pub. Serv. Com., 265 Pa. 274; Booth & Flinn v. Miller, 237 Pa. 297.

The amendment of 1918 merely grants the power to create one original issue of State bonds to the amount of fifty million dollars: Etter v. McAfee, 237 Pa. 557; Com. v. Snyder, 261 Pa. 57.

The power "to issue bonds" does not include the power to reissue bonds previously issued, and which have come back into the state treasury: Page v. Allen, 58 Pa. 338; Com. v. McAfee, 232 Pa. 36.

OPINION BY MR. CHIEF JUSTICE MOSCHZISKER, July 2, 1928:

Plaintiff filed a taxpayer's bill against the auditor general of the Commonwealth and the state treasurer, asking that they be restrained from "preparing and printing any bonds for the purpose of issuing them ......under the supposed authority of that part of article IX, section 4, of the Constitution of Pennsylvania, as amended, which authorizes the State to issue bonds for the purpose of improving and rebuilding highways." The injunction was awarded and this appeal followed.

The bill avers, inter alia, the facts, which we shall recite later, as to certain relevant constitutional provi-

sions and legislation; it also avers that bonds to raise money for highway purposes had been theretofore issued and sold by the Commonwealth to the amount of one hundred million dollars; that "of these bonds two million one hundred and twelve thousand dollars were redeemed and one million five hundred thousand dollars were purchased [by] the Commonwealth's Sinking Fund"; that on May 29, 1928, the Governor, purporting to proceed under the Act of April 18, 1919, infra, directed defendants to prepare and print highway bonds in the amount of three million dollars, for issuance under authority of that statute, to replace like securities purchased and cancelled, as recited above, and that defendants were about to comply with this direction; that the preparation and printing of these bonds will involve an unwarranted and illegal expenditure of state funds, since securities have already been issued to raise money for highway purposes to the full limit allowed by law.

Defendants' answer admits every fact set forth by plaintiff but denies all his conclusions of law; it prays that the bill be dismissed.

This court was furnished with copies of the opinion of the court below immediately upon its rendition, and with briefs well in advance of the date fixed for argument; thus we have been enabled to study the case and place ourselves in a position to comply with the request of counsel on both sides for a prompt decision.

At the legislative sessions of 1915 (P. L. 1107-08) and 1917 (P. L. 1264), a resolution was passed to amend article IX, section 4, of the Constitution, as follows: "No debt shall be created by or on behalf of the State, except to supply casual deficiencies of revenue, repel invasion, suppress insurrection, defend the State in war, or to pay existing debts; and the debt created to supply deficiencies in revenue shall never exceed, in the aggregate at any one time, one million of dollars [to this point the language is that of the Constitution of 1874, the new part reading thus] : Provided, however, that the Gen-

eral Assembly, irrespective of any debt, may authorize the State to *issue bonds to the amount of* fifty millions of dollars for the purpose of improving and rebuilding the highways of the Commonwealth." (The italics are ours.) This amendment was duly adopted by the people in 1918.

At the session of 1921 and again in 1923, two resolutions to further amend the above section were passed. The first of these repeated the resolution as we have quoted it, adding: "Provided further, however, that the General Assembly, irrespective of any debt, may authorize the State to issue bonds to the amount of thirty-five millions of dollars for the payment of compensation to certain persons from this State who served in the Army, Navy or Marine Corps of the United States during the World War." See 1921 P. L. 1236-7 and 1923 P. L. 1121. The second resolution to supersede the amendment adopted in 1918 used precisely the same wording as there employed, except that, in place of "fifty millions of dollars," it contained the words "one hundred millions of dollars." See 1921 P. L. 1238-9 and 1923 P. L. 1118.

At the general election in 1923, the last mentioned resolution was adopted as an amendment, and, in the course of deciding the point before us in Taylor v. King, 284 Pa. 235, 240, we held that, although the Constitution had been amended in another particular in 1920, yet, since there had been no effort to restrain the submission, in 1923, of the resolution in hand, it, having been approved by the people, was part of the organic law beyond attack.

In Armstrong v. King, 281 Pa. 207, we directed the Common Pleas of Dauphin County to enjoin the secretary of the Commonwealth from advertising for the election of 1924 the other resolution, containing the thirty-five million dollar bonus provision, for the reason that, a constitutional amendment having been submitted to the people in 1923, no other one could be considered until 1928.

Three Acts of Assembly have been passed under the amended constitutional provision now before us. The Act of April 18, 1919, P. L. 62, putting into effect the amendment of 1918, authorized and provided for the issuance and sale of bonds to an amount "not exceeding in the aggregate fifty millions of dollars......for the purpose of improving and rebuilding the highways of the Commonwealth." The Act of March 6, 1925, P. L. 24, effectuating the amendment of 1923, authorized and provided for the issuance and sale of bonds for highway purposes, in the total amount of fifty million dollars. Both of these acts expressly state that they were passed in accordance with the provisions of section 4, article IX, of the Constitution, as last amended prior to their respective dates. The Act of June 6, 1923, P. L. 494, provided for the issuance and sale of bonds in "such sum or sums of money and for such purposes as the Constitution authorizes the State to issue bonds." This act was declared unconstitutional in Hollinger v. King, 282 Pa. 157.

Before construing or attempting to apply such of these statutes as figure in this case, the first question we have to consider may be stated thus: What constitutional limitation is fixed by the amendment of 1923 on the power of the legislature to authorize the issuance and sale of bonds for highway improvement? Is the limit one hundred million dollars, the amount there named, or that sum plus the fifty millions mentioned in the amendment previously adopted in 1918? The next question is, Does the Constitution, as amended, permit the legislature to authorize the issuance of highway bonds only until the maximum amount named in the proviso to article IX, section 4, is reached, or does it permit the legislature to authorize money to be borrowed, from time to time, in such amounts that the maximum of outstanding bonds shall never exceed at any one time the amount so named? While this question is here put in the second place, it is treated as of first importance both by the court below and by appellant.

The concrete question in the case under the last of the above propositions is: One hundred million dollars of bonds having been issued by the State for improving and rebuilding the highways of the Commonwealth, and some of these obligations having been paid off and cancelled, does the Constitution as amended permit new bonds to be issued in place of those thus retired?

In this country the legislature of a state represents the sovereign will of a sovereign people, and, in the absence of constitutional restrictions, can authorize the state to borrow any amount of money for any purpose it sees fit (Norris v. Clymer, 2 Pa. 277, 285; Com. v. Hartman, 17 Pa. 118, 119; Sharpless v. Phila., 21 Pa. 147, 161; City of Phila. v. Field, 58 Pa. 320, 324; Page v. Allen, 58 Pa. 338, 345; Lewis & Nelson's App., 67 Pa. 153, 165; Russ v. Com., 210 Pa. 544, 554); therefore section 4 of article IX of our Constitution must be viewed as a restrictive measure, and the proviso with which we are particularly dealing must be treated as part of the general provision to which it is attached. In other words, the main purpose of the section in question is to limit the inherent right of the State to borrow money, and the proviso, by qualifying this restriction, becomes part of it. The office of a proviso is to "qualify, restrain, or otherwise modify the general language of an enacting clause." A proviso "is to be strictly [not liberally] construed" (U. S. v. Dickinson, 40 U. S. 141, 164; Ryan v. Carter, 93 U. S. 78, 83), and "can have no existence separate and apart from the provision which it is designed to limit or qualify." These are not technical but common sense rules, applicable to the interpretation of any written instrument; they govern the construction of constitutional provisions as well as of statutes. See Endlich on the Interpretation of Statutes, sections 184, 186 and 526; see also Booth & Flinn v. Miller, 237 Pa. 297, 306, and Perry County T. & T. Co. v. Pub. Serv. Com., 265 Pa. 274, 278, on the rule that "general principles governing the construction of stat-

utes apply also to the interpretation of constitutions."

The constitutional provision before us stipulates first of all that "No debt shall be created by or on behalf of the State"; then it excepts from this general principle debts which may be created for certain specified purposes; after this comes the proviso, which states, "Provided, however, that the General Assembly, irrespective of any debt, may authorize the State to issue bonds [to a named amount] for the purpose of improving or rebuilding the highways of the Commonwealth." When this proviso is read in connection with the immediately preceding matter, as it must be, and as a qualification of the general provision that "no debt shall be created by or on behalf of the State," except those of the kinds there specified, it becomes apparent that the phrase "irrespective of any debt," means irrespective of any of the debts named as exceptions in the provision dealing with the original subject-matter to which the proviso is attached; for the debts thus specified were the only ones mentioned, or which the State could incur, at the time the proviso was written. If the proviso is to be read according to defendants' contention as applicable to both existing and future conditions, and the phrase "irrespective of any debt" construed liberally, to comprehend, at any time, all outstanding debts, including highway bonds, it may readily be seen that there would be no limit on the power of the legislature to authorize such obligations to any amount, so long as no individual issue exceeded the total sum named in the Constitution; yet no one contends for such a meaning.

We can perhaps best see the meaning of the phrase, "irrespective of any debt" by drawing a mental picture. To speak figuratively: When the constitutional provision against State debts was adopted, the people erected a wall between their inherent right to borrow money for state purposes and their agent, the legislature, which must authorize the actual borrowing. This structure consists of the restrictive provision that "no debt shall

be created." In it, however, the people left five gates, as it were, through which, by way of exception to the restriction, the legislature could pass and impose on them certain money obligations. These gates we may mark respectively, "Except to [1st] supply casual deficiencies in revenue, [2d] repel invasion, [3d] suppress insurrection, [4th] defend the State in war, [5th] pay existing debts."

Thus the relations between the General Assembly and the people stood, up to 1915, when the leglislature expressed a wish that the latter should modify the constitutional barrier against creating debt, so that it might be empowered to authorize the issuance of bonds to a certain amount for highway construction and improvement. The resolution to bring about this modification, which was again passed in 1917, and ratified by the electors in 1918, provided that the General Assembly, "irrespective of any debt," might authorize the State to issue bonds to the amount of fifty million dollars to build and improve the highways of the Commonwealth. Now, to verify the meaning which we have given to this phrase, "irrespective of any debt," let us pursue further our metaphor of the wall and five gates. We have observed that these gates were, at first, the only openings through which the legislature could pass for the purpose of creating debts binding the State; therefore, the subsequent use of the phrase "irrespective of any debt" was but the erection of a sign-post to indicate that, whether or not the five permanent ways through the wall as originally constructed had been used to incur existing debts of the kinds the gates were opened for, there was a temporary way over the wall to the particular kind of debt allowed by the amendment. So far as we can see, this forms the sole purpose of the phrase in question.

The proviso to the amendment of 1923 is in precisely the same language as that used in the earlier one, the only difference being that the amount is raised from

fifty to one hundred million dollars. It supersedes the proviso in the amendment of 1918, eliminating the latter from the Constitution. It was not intended as, nor cast in the form of, a modification of the proviso in the earlier amendment; like the latter, it must be read as modifying the principal provision of the section in question, and debts for highway purposes are not there mentioned. Under these circumstances, the words "irrespective of any debt," must be applied, in the second as in the first amendment, to the original subject-matter, which they are employed to modify. Had it been intended that the proviso in the amendment of 1923 should at that time release a full one hundred million dollars of borrowing capacity, it would have been easy enough to have plainly said, "irrespective of any debt, including those previously incurred for highway work," or, "irrespective of any debt and without regard to bonds already issued to raise funds for highway improvement," or to have used some such expression, instead of repeating the exact language employed in the prior amendment, which was drawn and adopted at a time when, under our organic law as it then stood, no state debt for highway improvement was possible, and when, for this reason, the expression "irrespective of any debt" could have had no application to obligations of that character. Such being the fact, the expression must be applied, as originally intended, to the kind of debts mentioned in the Constitution immediately prior to the use of the words under discussion, and debts incurred for highway purposes are not there mentioned. Hence, we conclude that the words "irrespective of any debt" have no application to highway bonds. It follows that the proviso now before us for construction may be looked upon for present purposes as though it read, "Provided that the General Assembly may authorize the State to issue bonds to the amount of one hundred million dollars" to build and improve the highways of the Commonwealth. After all is said, the phrase "may authorize the State to issue bonds.

to the amount of," is simple language, which has been generally understood,—till recently questioned,—to mean that the amount named in the proviso represented the total of highway bonds, past and future, that the Commonwealth could issue.

Appellants' contention, however, seems to be that the proviso either was intended as a warrant empowering the legislature to authorize the borrowing, in the future, of the total sum named therein, without regard to past highway loans for which bonds had already been issued, or that it conferred a general borrowing capacity up to the amount which it mentions, so that bonds might be recurrently issued, as long as those outstanding never aggregated more than the amount named; but in our opinion neither of these positions is sound. This part of the Constitution cannot be read as though, each time the amount named therein is enlarged by amendment, it was a separate warrant empowering the legislature to authorize the borrowing of the particular sum mentioned, nor can it be looked upon as fixing the amount named as a limit within which, at any time, bonds may be issued and reissued to raise money for road purposes; the lawmakers have not so viewed it, nor can we.

The legislature from the beginning has treated the proviso, both as used in the first amendment, mentioning fifty million dollars, and in the second, mentioning one hundred million, not as a separate warrant to borrow these sums respectively, and not as fixing a named borrowing capacity for highway improvement, but simply as showing the total sum released for that purpose from the constitutional restriction on the State's power to create debts, the amount specified in the second amendment being properly treated as including that named in the first. In other words, the legislature viewed the first amendment as fixing fifty million dollars as the amount of bonds which it could authorize to be issued for highway purposes, and the second as fixing one hundred million as the total amount of bonds, past

and future, which could be issued for that purpose. We say that this has been the legislative construction because the Act of 1919, under which the first loan was created, provides that the Governor is authorized to borrow the amount there specified, not by virtue of a power granted by the amendment adopted in 1918, or as within a borrowing capacity there fixed, but "in accordance with the provisions of section 4, article IX, of the Constitution," as amended in 1918. Again, the Act of 1925, under which the second highway loan was created, authorized the borrowing of fifty million dollars "in accordance with the provisions of section 4, article IX, of the Constitution......as amended [in 1923]," and particularly states that the sum named is "in addition to" moneys previously borrowed for road purposes. This indicates a legislative thought that, on the facts as they then stood, only fifty million dollars of bonds could be authorized under the second amendment, though the sum of one hundred million is mentioned therein. Thus the Act of 1925 is a legislative construction that, in applying the amendment of 1923, the then existing fifty million dollars of bonded indebtedness for road work had to be respected, and that the practical effect of the proviso attached to this amendment was to release an additional fifty million from the constitutional restriction against creating debts.

Two statements by this court coincide with the legislative construction to which we have just called attention. In Hollinger v. King, 282 Pa. 157, 161, decided after 1923, an excerpt from the opinion of the court below, adopted by us, states that, under the Constitution as amended, the total amount which the legislature could authorize the Commonwealth to borrow for highway purposes was one hundred million dollars. In Taylor v. King, 284 Pa. 235, 238, we said that the resolution leading to the amendment of 1923 "provided for the submission of a change in article IX, section 4 [of the Constitution] so that the debt of the Commonwealth might

be increased *to* the amount of one hundred millions of dollars"; not so that the debt might be increased *by* one hundred millions of dollars, as suggested by defendants.

Finally, it will be noticed that the proviso does not say the General Assembly may authorize the State to issue bonds "never to exceed in the aggregate at any one time" the amount named, which is the language of the Constitution so far as the creation of debts to supply deficiencies of revenue is concerned. The proviso states merely that the General Assembly may authorize the Commonwealth "to issue bonds to the amount" specified. The variation in the language used was undoubtedly intentional (Com. v. Snyder, 261 Pa. 57, 63-4; M'Culloch v. Maryland, 17 U. S. 316, 413) and is very significant, though plaintiff's case does not, as defendants seem to think, depend on this variation. We conclude that the clause in question, being a qualification of a part of the Constitution which forbids the creation of debts, and in the nature of a release from that restriction, means that the total exercise of legislative authorization of highway bonds, past and future, shall never exceed the sum named,—at the present time, one hundred millions of dollars. In short, under the amendment adopted in 1923, which superseded the prior amendment of 1918, only one hundred million dollars of the State's inherent borrowing capacity is released from the restriction contained in the main provision of article IX, section 4, of the Constitution; and, since bonds have already been issued for the entire amount named, no more may go out.

In the face of the constitutional rule, "No debt shall be created by or on behalf of the State," it is inconceivable that, as contended by defendants, the people, by adopting the amendments here in question, agreed to a policy which would leave the Commonwealth always subject to a maximum debt of one hundred million dollars for highway purposes; a policy which, as counsel for plaintiff well says, might result in the expenditure

of many million dollars beyond this maximum, because, as he asserts, "All that would be necessary would be to make the maturities of the bonds short and the sinking fund provisions large, and the bonds could roll in and out of the treasury at the rate of one hundred million dollars every decade."

It is of no avail to argue, as defendants do, that, if the Constitution had said, "The debt created for improving the highways of the Commonwealth shall never exceed" a given sum, this would do no more than limit the borrowing capacity for that purpose to a total, at any one time, of the sum mentioned; for no such language appears in the Constitution. Nor does it avail defendants to suggest that the words " 'The General Assembly may authorize the State to issue bonds to [an amount named] for the purpose of improving and rebuilding the highways of the Commonwealth,' standing alone, must inevitably be construed as conferring a continuing borrowing power subject to a maximum outstanding amount of [debt]"; for these words do not stand alone; on the contrary, as we have already pointed out, they are contained in a proviso, and, when we come to construe them, must be so viewed.

In reaching our conclusions, though not depending upon legislative interpretations of the organic law, we have heeded them; for such interpretations always command judicial consideration: Moers v. City of Reading, 21 Pa. 188, 201, 202; Com. v. Mathues, 210 Pa. 372, 392; Armstrong v. King, 281 Pa. 207, 212. In addition to the Act of 1919, construing the amendment of 1918, and the Act of 1925, construing the amendment of 1923, there is still another legislative interpretation which may be taken into account. At the session of 1925 (P. L. 830), and again at the session of 1927 (P. L. 1026), a resolution was passed for another constitutional amendment (to come before the people in November, 1928), raising the amount in the proviso we have been examining to one hundred and fifty millions of dollars. This proposed

amendment has not yet been voted on by the electors, but the resolution passed in connection therewith by the General Assembly is indicative of the latter's construction of the Constitution. If the General Assembly had regarded the existing amendment, adopted in 1923, as releasing one hundred millions of borrowing capacity in addition to the fifty millions previously released by the amendment of 1918,—thus leaving fifty millions of dollars available after the bond issue provided for in the Act of 1925,—it is inconceivable that it would not have passed legislation to authorize the issuance of bonds to use up this available borrowing capacity before submitting to the people another amendment, making an additional fifty million dollars available for road purposes; or, under the logic of one of defendant's suggestions, making two hundred million dollars available. Evidently the legislature, in putting forth the proposed third amendment to article IX, section 4, of the Constitution, entertained the thought that the power released to it by the amendment of 1923 had been exhausted.

We are faced with the question, Why, when it came to the pending change, did the legislature employ a superseder form of amendment, naming the already released and used borrowing power as well as the additional amount for future use? The reason is apparent; the lawmakers evidently thought the borrowing limit for highway work had been reached, and that, bonds for the full amount released having been issued, when releasing additional borrowing capacity the Constitution should show the fundamental bases on which the entire debt for road improvement, already incurred and yet to be incurred, rested. The same may be said of the legislative thought as to the amendment of 1923, which raised the amount of released borrowing capacity from fifty to one hundred million dollars. Under either the last mentioned amendment or the one now pending, if the latter should be adopted, the difference between the amount named therein, respectively, and the amount previously stated

in the Constitution represents the only increase in borrowing capacity thereby released, namely, fifty million dollars on each occasion. The full fifty million covered by the amendment of 1918 having been raised, and a like amount having been raised under the amendment of 1923, all released right to borrow for highway purposes is exhausted; but the Constitution will continue to show the fundamental basis on which the hundred million of bonds were issued. Under these circumstances, the part of the Constitution in question can hardly be designated, to use the words of defendants, "a dead letter." We may add, the fact that the highway proviso will remain in the Constitution even after all bonds issued thereunder are retired, is of no particular significance, for there is no principle which forbids the people from temporarily lifting a constitutional ban in this manner if it suits their purpose so to do. The proposed constitutional change mentioned in the 6th paragraph of this opinion furnishes a striking example of such procedure. There, just as with the highway amendments, the resolution took the form of a proviso, its general terms being in the precise language of the highway provisos, while its specific terms empowered the legislature to issue bonds "to the amount of thirty-five millions of dollars for payment of compensation to certain persons" who served in the World War. This proposition, if approved by the electors, could not be more than a temporary lifting of the ban against state debts, because, even though the bonus payments thereby contemplated should extend over a period of years, in a comparatively short time every person capable of benefiting by them would be dead; yet, if the amendment is adopted, after serving its purpose and after all bonds issued thereunder are paid, it will still remain part of the written constitution. When the demonstrable fact that this proposed amendment (in the precise language of the highway amendments, so far as general terms are concerned) could have been intended only as a temporary expedient, is appreciated, a like legis-

42

lative design in the case of the highway amendments becomes quite plain; and, here again, this tends to support the consistent construction placed by us on the latter.

Still another approach to this case shows, as a matter of fundamental law, that the three-million-dollar reissue of bonds, which was enjoined by the court below, could not be sustained. In Brooke v. Phila., 162 Pa. 123, 127, referring to article IX, section 4, of the Constitution, we said: "As to the Commonwealth itself, the intention was to wipe out the existing debt, and thereafter permit the incurring of only a limited amount of debt . . . . . . and that temporarily." When the State creates a debt the legislature must specify the particular purpose for which the money is to be used, and the proceeds of the loan can be devoted only to that purpose: Article IX, section 5. The Constitution does not make provision for refunding State loans; to liquidate debts incurred under article IX, section 4, a sinking fund is required, the money to be "used and applied" only for the extinguishment of existing debts: Article IX, section 11. To carry out these constitutional requirements, the Acts of 1919 and 1923 stipulate that each of the bond issues therein provided for shall be retired and cancelled at maturity, or, if bonds are earlier purchased, with moneys in the sinking fund, they shall be cancelled or destroyed. In each instance the specific borrowings authorized are directed to be liquidated and entirely cancelled within the time fixed by the respective acts. If the statutes in question had not contained these provisions, they would not have met the requirements of the Constitution; for, under our organic law, the electors, in approving the amendments before us, gave no power to the legislature to continue indefinitely loans for road purposes by substituting new loans for those which were cancelled; each debt for which the obligation of the Commonwealth is issued must be extinguished when it matures by funds appropriated to that purpose: Article

IX, section 11. In short, no express authority to make recurrent loans, by the issuance of refunding or substituted bonds for those purchased or cancelled, is given by the Constitution, and such power is impliedly (Page v. Allen, 58 Pa. 338, 345) denied by the provisions to which we have here called attention. Even if there had been conferred the power to refund bonds under some circumstances,—for instance, when sufficient money to pay them at maturity had not been received by the sinking fund,—this would not authorize the sale of such securities where the transaction would have the effect, as here, of putting the debt back to where it was before any bonds were retired, and thus of nullifying the prior payment of bonds from the sinking fund; the amount necessary to meet these payments was appropriated to that fund for the express purpose of permanently extinguishing bonds then outstanding. This scheme of debt liquidation, set up by the Constitution, cannot be departed from either directly or indirectly (Coffin v. Indianapolis, 59 Fed. 221, 230); and, in point of fact, the legislature has made no attempt to do so.

Taking advantage of the released borrowing capacity under the amendment of 1918, the legislature passed the Act of 1919, which, by section 1, authorized the Governor to "borrow from time to time," for highway purposes, "a sum or sums of money not exceeding in the aggregate fifty millions of dollars." It will be noticed that this legislative authorization is not to issue bonds "never to exceed in the aggregate at any one time" fifty millions of dollars, but to borrow a total sum of money not exceeding fifty millions. The expression "from time to time" as here used evidently means, from time to time till the total sum has been raised by bonds issued. When that sum was raised, and bonds issued therefor, the statutory authority under the Act of 1919 was exhausted. That part of section 2 of the act which makes it the duty of the state treasurer and auditor general to see to the preparation and printing of the bonds is, of

course, effective only where bonds can be legally issued. The Act of 1925 was passed in order to take advantage of the amendment of 1923. This statute authorizes the borrowing of fifty million dollars, "in addition to any moneys heretofore borrowed under Act of...... 1919," and it expressly stipulates the times when particular amounts making up the full fifty million shall be borrowed, and that bonds shall be issued accordingly. Here, again, it is quite plain that when the total of fifty million dollars named in the Act of 1925 was raised, the authority there granted to borrow on the credit of the Commonwealth was exhausted. Thus we find the Constitution and the statutes in accord; and therefrom we conclude that, the full amount named in the amendment of 1923 having been realized by the State, there is nothing in our law to warrant, under any circumstances, the issue of further bonds to finance road construction and improvement, or to authorize the reissuance of bonds which have been purchased by the sinking fund, cancelled or retired; and this is equally true whether the proposed bonds be viewed as reissued or as newly issued.

In Brooke v. Phila., 162 Pa. 123, 127, this court said that, while the Constitution provided that municipalities might at all times owe a certain fixed percentage of what they were worth, yet when dealing with the subject of the debt of the Commonwealth it showed quite a contrary intention; there, the design was to "wipe out" all existing financial obligations and, so far as feasible, to keep the State out of debt. The amendments which figure in the present case indicate no intent to depart from this established general purpose. We agree with plaintiff that, at the times these amendments were approved and legislation enacted to carry them into effect, it was "estimated that the sums authorized to be borrowed by the issuance of bonds were sufficient to put the highways of the Commonwealth into proper condition," or into such condition that thereafter they could be

cared for, extended, and improved out of current revenues, and there was no intention to inaugurate a scheme of financing whereby bonds could be issued recurrently within a fixed constitutional limit. This being the case, the injunction prayed for was properly decreed.

The decree appealed from is affirmed at cost of defendants.